Abraham J. Gellinoff, J.
Defendant Elmyr deHory moves to dismiss the complaint and to vacate a default judgment entered against him on the ground that the court lacks personal jurisdiction over him. In the alternative, deHory seeks to vacate "the default judgment and to defend on the merits. The primary issue is whether the cause of action alleged by plaintiff arises from the transaction by deHory of “ any business within the state ” either “ in person or through an agent ”, thereby per *498 mitting our courts to “ exercise personal jurisdiction ” over him (CPLB, 302, subd. [a], par. 1).
The action is for libel. Plaintiff claims that he was defamed in a book entitled “Fake!”, written by defendant Clifford Irving, and published in New York by defendant McGraw-Hill. The book purports to depict defendant deHory’s life. Irving and McGraw-Hill have appeared in the action; deHory has defaulted.
On a prior motion by Irving to dismiss the complaint for lack of personal jurisdiction, the Appellate Division ruled that the cause of action arose from Irving’s transaction of business in New York (38 A D 2d 53 [1st Dept., 1971], app. dsmd. 30 N Y 2d 653 [1972]). In the instant motion, deHory contends that notwithstanding the court’s jurisdiction over Irving, it lacks jurisdiction over him.
The events leading up to the publication of the book are described by Irving in his ‘‘ Author’s Note ’ ’ to the book. Irving writes that “ one day in the spring of 1967 ”, deHory, “ under great stress and in need of help * * * made an amazing confession to me and later amplified this confession by narrating in detail his life’s story.” Sometime after this revelation, Irving entered into negotiations with McGraw-Hill for the publication of a book based upon deHory’s story.
Subsequently, on February 7,1968, Irving and deHory entered into a contract on the Island of Ibiza, Spain. Under its terms, deHory granted Irving exclusive worldwide rights to the story to be written. about deHory’s life. DeHory agreed to make himself available to Irving for a period of six months to enable Irving to obtain details. In return, deHory became entitled to approximately one half of any proceeds received by Irving for the rights to the material.
The contract required Irving to “ make all possible efforts ” to “ sell or license the aforementioned worldwide publishing and dramatic rights granted him, for the best prices and the most advantageous terms of participation ” and to “ consult ” with deHory on any offers received.
Additionally, Irving was required to submit the final manuscript to deHory and to “ eliminate from the manuscript any passage or passages which * * * [deHory] or his legal counsel believes to be civilly or criminally incriminating, under the laws of any state or nation.” Irving also agreed to refuse to enter into an agreement with a publisher unless Irving retained the right of approval of manuscript changes. If Irving Were disposed to accept any changes proposed by a publisher, *499 he was obliged to “ first seek * * * [deHory’s] approval, such approval not to he unreasonably withheld.”
After this contract was executed, Irving entered into a contract with McGraw-Hill for publication of the book.
Plaintiff contends that ¡under the provisions of deHory’s contract with Irving, Irving became the agent of deHory within the meaning of CPLB 302 (subd. [a], par. 1). Plaintiff further contends that deHory’s own subsequent acts, and those of his agent Irving, constituted “ purposeful activity in this State in connection with the matter in suit ’ ’ (Longines-Wittnauer Watch Co. v. Barnes & Reinecke, 15 N Y 2d 443, 457 [1965]), giving this court jurisdiction under CPLB¡302 (subd. [a], par. 1). DeHory, on the other hand, asserts that Irving was not his agent, and that he, deHory, performed no acts in New York in connection with the matter in suit.
What constitutes an “agency” for jurisdiction purposes under CPLB 302 “has bedeviled the courts ” (McLaughlin, Practice Commentaries to CPLB 302 in McKinney’s Cons. Laws of N. Y., Book 7B, CPLB). However, the decisions requiring that formal employment or exclusive agency be shown before jurisdiction may be based on the acts of an agent, have generally involved a lawsuit by the alleged agent, in which the only asserted acts of the principal in New York were those of the plaintiff agent (see, Standard Wine & Liq. Co. v. Bombay Spirits Co., 20 N Y 2d 13 [1967]; McKee Elec. Co. v. Rauland-Borg Corp., 20 N Y 2d 377 [1967]; Millner Co. v. Noudar, Lda., 24 A D 2d 326 [1st Dept., 1966]). The ¡Court of Appeals has noted that “ realities ” rather than formal agency requirements are the test when , a third party seeks to base jurisdiction over the non-resident defendant on the acts of his purported agent (Parke-Bernet Galleries v. Franklyn, 26 N Y 2d 13, 19, 19 n. [1970]).
In the instant case, while the contract between deHory and Irving does not specifically designate Irving as deHory’s agent, its very purpose is to empower Irving to act on behalf of deHory in publicizing deHory’s story and exploiting it for profit to both himself and deHory. DeHory acknowledges in a letter to McGraw-Hill that he was aware that Irving had already entered into negotiations with McGraw-Hill in New York prior to the execution of deHory’s contract with Irving, and, indeed, that he knew that McGraw-Hill had declined to publish the book until deHory granted Irving exclusive rights to the material, in writing. Furthermore, deHory retained control over Irving’s efforts to exploit deHory’s ¡story — requiring Irving to “con- *500 suit ’ ’ with him upon receipt of an offer for the rights, and. maintaining ultimate power over the language of the manuscript.
Thus, Irving acted for the benefit of, and with the. knowledge and consent of deHory, and deHory retained some element of control over Irving’s activities. The court therefore holds that Irving iwas deHory’s agent for the purpose of publishing the book “ Fake! ” in New York (see Collateral Factors Corp. v. Meyers, 39 A D 2d 27, 29 [1st Dept., 1972]; De Nigris Assoc. v. Pacific Air Transp. Int., 38 A D 2d 363 [1st Dept., 1972]).
Since it has already been established in the instant case that Irving transacted business within the State with respect to the publication of the book '(38 A D 2d, at p. 56), and since Irving was also deHory’s agent, it follows that deHory transacted business within the State “through an agent,” sufficient to empower our courts to “exercise jurisdiction” over deHory (CPLR 302, subd. [a], par. 1).
Moreover, deHory transacted business “in person” within the State ¡(OPLR 302, subd. [a], par. 1). Thus, after Irving completed the manuscript of “Fake!” deHory attempted to exercise the right retained by him in his contract with Irving to veto passages in the book. In a letter to McGraw-Hill in New York, deHory reminded the publisher of the history of his contract with Irving — asserting that the agreement had been “ set up entirely” by Irving and McGraw-Hill’s attorneys— and stated that the contract “ among other things says, and this is the most essential part, that nothing can be published that in any way endangers my position in Spain or could lead to prosecution in Spain or any other country.” DeHory recited various passages in the manuscript which he claimed vero “ gravely damaging,” and threatened to bring a lawsuit unless the “ flagrant violation ” of his contract with Irving was nalted. Although McGraw-Hill, for its own purposes, responded that since its agreement was with Irving only, deHory should not complain to it about Irving’s violations of his contract with deHory, the publisher nevertheless — as evidenced by various interoffice memoranda — undertook to correct the challenged passages, and sent a copy of deHory’s letter to Irving, suggesting alternatives and urging that acceding to deHory’s demands “would eliminate unpleasantness.” The changes were ultimately made, after Irving met with deHory in Ibiza.
In Parke-Bernet Galleries v. Franklyn (26 N Y 2d 13, 17, supra), the 'Court of Appeals observed that “ in this day of instant long-range commuications, one can engage in extensive purposeful activity here without ever actually setting foot in *501 the State ”, and held (p. 19) that “ the mere fact that the defendant was able to arrange to conduct his extensive and purposeful activity in New York without having to physically come here does not enable him to avoid the jurisdiction of our courts.”
In sum, deHory sought to tell his story. He chose Irving as his vehicle, and, knowing that Irving would obtain a publishing contract in New York, entered into an agreement with him to share the financial reward from the telling of the story; he retained control over the manner in which the story would be told through the New York publisher; he made himself “ an active participant” (Parke-Bernet Galleries v. Franklyn, 26 N Y 2d 13, 17, supra), in the publishing process in New York by exercising the control he had retained by demanding of the publisher certain changes in the manuscript.
DeHory was “ within * * * this ¡State * * * in person or by agent and, through dealing herein with another, effectuate [d] or attempt[ed] to effectuate herein a purpose directly related to his economic affairs ” (Millner Co. v. Noudar, Lda., 24 A D 2d 326, 331, supra), and therefore transacted business within the State. Since the cause of action herein arises from the transaction of that business — the publication of the book “ Fake! ”— the court has jurisdiction over deHory.
The motion to dismiss is accordingly denied.
In the alternative, deHory seeks an order vacating the default judgment entered against him in July, 1971, and permitting him to defend the issue of liability on the merits. It is undisputed that deHory was aware of the proceedings prior to the entry of the default judgment. It is further undisputed that he was served with a copy of the judgment with notice of entry in July, 1971. Thus, this motion to vacate was initiated some 16 months after the entry of judgment and notice thereof to deHory, and is therefore beyond the one-year period in which a motion to vacate a judgment on grounds of excusable default is permitted (CPLR 5015, subd. [a], par. 1).
DeHory, however, bases his request on the court’s “ inherent discretionary power to vacate its own judgment for sufficient reason and in the interest of substantial justice”. But the sole excuse proffered by deHory for his failure to appear or promptly move to vacate the default judgment is that he did not wish to burden the court with his motion to dismiss while Irving’s motion for similar relief was pending. For, asserts deHory, if Irving’s motion had been granted, his own would have been granted a fortiori.
*502 ■ The Appellate Division denied Irving’s motion on December 23, 1971, and, even if deHory chose to await Court of Appeals action, that court dismissed the appeal on March 16, 1972. DeHory offers no explanation at all for the delay of almost a year after the Appellate Division decision, and some eight months after the dismissal of the appeal ¡by the Court of Appeals.
The default herein is not excusable, and the delay in seeking to vacate the judgment does not present an appropriate case for the exercise of such discretionary power as may exist. The alternative motion is therefore in all respects also denied.