TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, Plaintiff,

v.

David L. BUTLER, James L. Grauer, James E. Kassis, and One City Centre Associates, a California Limited Partnership, Defendants.

No. 84 Civ. 3211.

United States District Court, S.D. New York.

Aug. 23, 1984.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff; Robert E. Gerber, New York City, Jerry P. Sattin, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants; Mark

A. Belnick, Colleen McMahon, New York City, Martha A. Geer, of counsel.

## OPINION

### EDWARD WEINFELD, District Judge.

Plaintiff, Teachers Insurance and Annuity Association of America ("Teachers"), is a New York nonprofit corporation which provides annuities and insurance programs to colleges, independent schools and other educational institutions, and derives income for such programs from long term loans on commercial properties and real estate investments.

The defendant, One City Centre Associates ("OCCA"), is a California limited partnership engaged in the development and construction of real estate in California. It is composed of three general partners, David L. Butler, James E. Kassis, and James L. Grauer, also named as codefendants (collectively "defendants" or "the Butler group").

Plaintiff commenced this action to obtain specific performance of a Committment Letter ("Financing Agreement") pursuant to which Teachers agreed to lend, and OCCA agreed to borrow, $20,000,000, in long term financing of a commercial office building to be constructed by OCCA in Sacramento, California, to replace a temporary outstanding construction loan held by the Bank of America, a California corporation.

The defendants move to dismiss the complaint pursuant to Rule 12(b)(2), Fed.R. Civ.P. for lack of personal jurisdiction over them, or, in the alternative, to transfer the action pursuant to 28 U.S.C., section 1404(a) to the Eastern District of California.

## IN PERSONAM JURISDICTION

Since this is a diversity action, the determination of the issue of personal jurisdiction is governed by the law of the State of New York.[1] Limited discovery on the issue was ordered by the Court. The Court has before it the deposition testimony of the primary individuals involved in negotiating the financing agreement, as well as numerous affidavits which present the factual matters pertinent to their jurisdictional positions and the parties' respective contentions. In the absence of a full blown evidentiary hearing on the merits, plaintiff on this motion, through its own affidavits and supporting material, need only make a prima facie case that the Court has jurisdiction over the defendants.[2] However, such a prima facie showing does not relieve the plaintiff of its burden of establishing in personam jurisdiction upon the trial proper by a fair preponderance of the evidence.[3] After a word-by-word reading of the deposition testimony and consideration of the extensive affidavits and voluminous exhibits offered by the parties, the Court finds that plaintiff has sustained its burden on this motion that the defendants are properly before the Court.

### The Background Facts

In 1981, David Butler ("Butler"), on behalf of OCCA, decided to develop a commercial building, One City Centre, in Sacramento, California. The proposed project was announced in real estate industry publications. Robert Sonnenblick ("Sonnenblick"), an officer of Sonnenblick-Goldman Corp. ("Sonnenblick-Goldman")[4] a New

1. *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223–25 (2d Cir.1963) (en banc).

2. *Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (2d Cir.1981); *Visual Sciences v. Integrated Communications*, 660 F.2d 56, 58 (2d Cir.1981); *Welsh v. Gibbs*, 631 F.2d 436, 438–39 (6th Cir. 1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981); *Data Disc, Inc. v. Systems Technology Assocs.*, 557 F.2d 1280, 1285 (9th Cir.1977); *United States v. Montreal Trust*

*Co.*, 358 F.2d 239, 242 (2d Cir.), *cert. denied*, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966).

3. *Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (2d Cir.1981); *Visual Sciences v. Integrated Communications*, 660 F.2d 56, 58 (2d Cir.1981); *Data Disc, Inc. v. Systems Technology Assocs.*, 557 F.2d 1280, 1285 (9th Cir.1977).

4. Unless otherwise indicated, any reference to "Sonnenblick-Goldman" is to the New York corporation.

York mortgage broker, with its offices at 1251 Avenue of the Americas, telephoned Butler from New York and offered Sonnenblick-Goldman's services in procuring permanent financing for the project. After several conversations between them, OCCA engaged Sonnenblick-Goldman to locate sources of permanent financing. On September 18, 1981, Butler executed the first of a series of written letter agreements with Sonnenblick-Goldman addressed to its office in New York City, which served "to authorize Sonnenblick-Goldman Corp. as our exclusive financing agents" for the proposed building and agreed to a fee of three-quarters of one percent of the total proceeds with power in the Butler group to reject or accept any commitment arranged by Sonnenblick-Goldman Corp.[5] Thereafter, on November 10, 1981, the Butler group executed a similar letter agreement, but increased Sonnenblick-Goldman's fee to one per cent of any loan obtained.[6] These authorizations specified no particular proposed lender. Following the execution of these general authorizations, Sonnenblick-Goldman prepared in New York City a bound brochure—a financing package—which contained significant information about the One City Centre project, and which was distributed by Sonnenblick-Goldman to potential lenders in several states. Sonnenblick-Goldman narrowed the group of prospective lenders to three and presented the choices to OCCA with a recommendation that OCCA seek the financing from Teachers. OCCA agreed to the recommendation, and between March and July, 1982, executed three separate letter agreements addressed to William Stern ("Stern"), Executive Vice President of Sonnenblick-Goldman at its office in New York City, which specifically named Teachers as the proposed lender. The agreements authorized Sonnenblick-Goldman Corp. to secure "a financing commitment from Teachers Insurance and Annuity Association," set forth various proposed terms, and warranted that Sonnenblick-Goldman Corp. was the sole broker in the transaction and fixed its fee at one percent of the loan.[7]

Stern was the principal contact with Teachers. He was of considerable experience in securing financing from large investment institutions on behalf of proposed lenders who retained the services of Sonnenblick-Goldman. In January 1982, even before the specific written authorizations had been executed, Stern had been in touch with Teachers and following receipt of the authorizations, carried on negotiations in efforts to obtain the financing as authorized by the Butler group.

Over a period of about eight months, Stern conferred with Daniel Sullivan, Vice President of Teachers, and John Lohr, one of its loan officers, with respect to the amount of the loan, the interest rate, the period of the loan, its prepayment, preleasing requirements, appraisals and a contingent interest in gross rental income described as a "kicker," in an effort to hammer out definitive proposals for acceptance or rejection by OCCA. Their meetings took place in New York City at the offices of Teachers; letters and memoranda were sent from one office to the other in New York City; and telephone conversations between Stern and Sullivan and Lohr were carried on from their respective offices in New York City. As the discussions continued between Stern and the Teachers' representatives, letters embodying the results of the discussions were sent by Teachers from its office in New York City addressed as follows:

One City Centre Associates
c/o Sonnenblick-Goldman Corp.
1251 Avenue of the Americas
New York, New York 10020

As the negotiations progressed and various terms were refined, Stern and Robert Sonnenblick advised the Butler group of these matters to obtain their acceptance or rejection. Finally, after eight months of such meetings, phone calls, and exchanges of

---

5. Plaintiff's Deposition Ex. 2.

6. Plaintiff's Deposition Ex. 4.

7. Plaintiff's Deposition Exs. 14, 16, 18.

correspondence between Sonnenblick-Goldman (principally Stern) and Teachers, Teachers approved a $20,000,000 loan and prepared a Commitment Letter setting forth its details, which OCCA accepted on September 9, 1982. Teachers' notification of its acceptance of the loan was either mailed or hand delivered in New York City to OCCA addressed as indicated above, c/o Sonnenblick-Goldman Corp.

The precise details of the agreement are not necessary for the disposition of this motion. In general, it provides for a $20,000,000 loan at 14–1/4% interest repayable over a thirty-five year period in fixed monthly installments. It contains a prepayment privilege after seventeen years upon stipulated conditions. It also provides that Teachers receive a contingent 40% "kicker." Following acceptance of the Commitment Letter, which the parties acknowledged as "a binding agreement between us," plaintiff's counsel, in July 1983, forwarded to OCCA's representatives drafts of documents for execution at the closing scheduled for April 30, 1984 at Sacramento. At the closing, a dispute arose concerning a provision with respect to prepayment during the first seventeen years which the Butler group contended was a material modification of, and contrary to, a prepayment provision that had been agreed upon. As a result, the mortgage financing was never consummated, whereupon Teachers commenced this action.

*Discussion*

■ It is undisputed that neither OCCA nor the Butler group transacts business in New York, nor that any of the individual defendants was present in New York in connection with the negotiations that resulted in the loan agreement. However, it is now black letter law that one need not be physically present in New York State as a prerequisite to jurisdiction over a non-resident.[8] Plaintiff contends that the defendants are subject to in personam jurisdiction because of the activities in New York on their behalf by Sonnenblick-Goldman. It bases its claim on the reach of New York's long arm statute, which, in pertinent part provides:

(a) Acts which are the basis of jurisdiction.

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent:

1. transacts any business within the state .... [9]

■ Defendants' amenability to jurisdiction under the foregoing provision depends upon whether Sonnenblick-Goldman Corp. was "an agent" whose activities in New York State are attributable to defendants.[10] To constitute an agent for the purposes of the statute, the alleged agent must have engaged in purposeful activities in this State for the benefit of and with the knowledge and consent of the non-domiciliary and the non-domiciliary must exercise some element of control over the agent.[11] The basic inquiry is whether, looking at the totality of the alleged agents' conduct, purposeful activities were performed in this forum in relation to the Commitment Letter "albeit preliminary or subsequent to its execution." [12]

8. *See, e.g., Parke-Bernet Galleries v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970); *L.F. Rothschild v. Thompson,* 78 A.D.2d 795, 433 N.Y.S.2d 6 (1st Dep't 1980).

9. N.Y.Civ.Prac.Law § 302(a)(1) (Supp.1983–84).

10. *Mayes v. Leipziger,* 674 F.2d 178, 181 (2d Cir.1982); *PPS Inc. v. Jewelry Sales Reps., Inc.,* 392 F.Supp. 375, 380 (S.D.N.Y.1975).

11. *Louis Marx & Co. v. Fuji Seiko Co.,* 453 F.Supp. 385, 390 (S.D.N.Y.1978); *accord Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981); *see Cato Show Printing Co. v. Lee,* 84 A.D.2d 947, 949, 446 N.Y.S.2d 710, 713 (4th Dep't 1981); *East New York Savings Bank v. Republic Realty,* 61 A.D.2d 1001, 1002, 402 N.Y.S.2d 639, 641 (2d Dep't 1978).

12. *Sterling Nat'l Bank & Trust Co. v. Fidelity Mortgage Investors,* 510 F.2d 870, 873 (2d Cir. 1975); *Galgay v. Bulletin Co.,* 504 F.2d 1062, 1064 (2d Cir.1974) (*quoting Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 453, 457, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75, *cert. denied,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965)).

■ First, as to the relationship of Sonnenblick-Goldman Corp. to the defendants: The evidence is substantial, as already related above, that Sonnenblick-Goldman, located in New York, was specifically and exclusively authorized by OCCA to secure on its behalf "a financing commitment from Teachers Insurance and Annuity Association," a New York lender. That authorization was repeated on two subsequent occasions as Stern continued his activity with Teachers to secure the loan on terms satisfactory to the Butler group. The very language employed by defendants in those authorizations would seem to put at rest any contention that Sonnenblick-Goldman was not acting for and on behalf of OCCA and with its express authority. The defendants, however, seek to overcome the force of this documentary proof upon a claim that Sonnenblick-Goldman was merely a "conduit," a "middle man," or a "go between." However, as this Court stated in a somewhat related context, "what the parties call [ ] [Sonnenblick-Goldman] matters little—the formal trappings of agency are not as important as the realities of the situation."[13] Indeed, under New York law:

> The activities of the representative in New York will be attributed to the non-domiciliary if it requested the performance of those activities in New York, and those activities benefit it, regardless of whether the representative acted as an agent or an independent contractor.[14]

The realities of the situation compel the conclusion that Sonnenblick-Goldman Corp. was designated by OCCA to act on its behalf to obtain the desired financing and that it knew that Stern, principally, and Robert Sonnenblick, to a lesser degree, were exerting efforts to achieve that result in their negotiations in New York City with the representatives of Teachers.

In the light of all the foregoing, it is difficult to understand, much less to accept, the defendants' contention that they had no control over Sonnenblick-Goldman and "could not tell Sonnenblick-Goldman where or how to look for funds."[15] This contention is utterly without merit since OCCA, by its thrice-repeated authorizations, had already agreed that the funds were to be sought from Teachers. It is beyond challenge that as the various proposals were negotiated with Teachers by Sonnenblick-Goldman it could not make a binding commitment. All proposals had to be submitted to OCCA for its decision. OCCA exercised complete control in deciding to accept or reject the various proposals transmitted to Sonnenblick-Goldman and based thereon made the ultimate decision when it agreed to the Commitment Letter which became the binding agreement upon which this action is based.

In a further effort to resist in personam jurisdiction, the defendants contend that even if Sonnenblick-Goldman's actions in New York were attributable to defendants for jurisdictional purposes, such actions did not reach the level of "transacting business" in New York—that the services performed by Sonnenblick-Goldman did not meet the test of meaningful and purposeful conduct of a substantial nature in furtherance of the loan agreement. In effect, defendants denigrate the Sonnenblick-Goldman activities in this district, contending that it (and Stern) acted "as an intermediary to relay messages and positions between the principals and to help prepare the documents that [Teachers] required to

**13.** *Louis Marx & Co. v. Fuji Seiko Co.,* 453 F.Supp. 385, 390 (S.D.N.Y.1978) (footnote omitted); *see PPS, Inc. v. Jewelry Sales Reps., Inc.,* 392 F.Supp. 375, 380 (S.D.N.Y.1975); *East New York Savings Bank v. Republic Realty,* 61 A.D.2d 1001, 1002, 402 N.Y.S.2d 639, 641 (2d Dep't 1978); *Stark v. Spitz,* 38 A.D.2d 966, 966, 331 N.Y.S.2d 709, 710 (2d Dep't 1972); *Legros v. Irving,* 77 Misc.2d 497, 499, 354 N.Y.S.2d 47, 50 (Sup.Ct.N.Y.Co.1973).

**14.** *East New York Savings Bank v. Republic Realty Mortgage Corp.,* 61 A.D.2d 1001, 1002, 402 N.Y.S.2d 639, 641 (2d Dep't 1978); *see also Cato Show Printing Co. v. Lee,* 84 A.D.2d 947, 446 N.Y.S.2d 710 (4th Dep't 1981).

**15.** Defendants' Brief at 3.

process the loan application,"[16] and that all substantive negotiations and activities took place in California or by mail with Stern simply serving as a conduit.[17]

To say that Stern was a messenger and a conduit distorts the record. Over an eight-month period Stern negotiated with Teachers' representatives the amount of the loan, the rate of interest, terms of repayment, maturity date of the loan, prepayment and other material matters. In fact, after the Commitment Letter was executed, when the market rate of interest dropped to approximately 12%, Stern, at the request of defendants, exerted efforts to obtain a reduction in the rate of interest but was told "an agreement is an agreement," binding upon both parties whether the market rate of interest went up or down. A study of the entire record on this motion upholds Lohr's observation that Teachers "would never have made the loan to the Butler Group at all if it were not for Mr. Stern's persistent support of the Butler Group's request .... Mr. Stern was the Butler Group's salesman, and he sold us on making this loan .... [T]he negotiation of the particular terms of the loan—especially its amount—was the result of Mr. Stern's efforts on behalf of his principals."[18]

In a continued effort to disparage the significant and meaningful activities in this district by Sonnenblick-Goldman on behalf of the defendants, they contend that in fact there were no substantial negotiations in New York; that all negotiations took place in California or by mail or telephone and that defendants met and negotiated with representatives of Teachers and Sonnenblick-Goldman only in California.[19] This contention flies in the face of the record. It is true that Lohr in March 1982, some months after ongoing negotiations in this

district and when it appeared the financing was likely, travelled to Sacramento to make an on site inspection of the proposed project and while there conferred with members of the Butler group and Robert Sonnenblick as did Sullivan on June 22, 1982.[20] However, even assuming, as defendants contend and plaintiff denies, that substantive matters were discussed thereat, and further, even accepting defendants' contention that the final definitive terms were agreed upon on June 22, 1982, these meetings do not detract from the fact, already described, of the extensive, meaningful and purposeful negotiations in New York City which eventuated in the Commitment Letter. The Butler group's attempt to attribute significance to the California meetings and to disavow Sonnenblick-Goldman's meaningful activities on their behalf in the negotiations with Teachers in New York is dissolved by the acknowledgment of both Butler and Kassis (an attorney) that Teachers "refused to deal with us directly; everything had to be done through Sonnenblick-Goldman as loan broker."[21]

It is not without significance that the agreement provides:

9. This agreement is delivered and is intended to be performed in the State of New York and shall be construed in accordance with the laws of said State, except that as to the legality of the said interest rate, the laws of the state of the situs of the said property shall govern. Upon compliance with all of the covenants and conditions herein, payment of the loan proceeds will be made at or from our office in New York City.

■ Finally, the defendants contend that even if it be found that Sonnenblick-Goldman engaged in substantial and purposeful

---

16. *Id.* at 4.

17. *Id.* at 3–4; Defendants' Reply Brief at 31.

18. Lohr Affid. at 12.

19. Defendants' Brief at 3.

20. Both Sullivan and Lohr deny that at these sessions any substantive matters were discussed, and contend they were solely fact finding and

for inspection purposes. Moreover, as already noted, both Kassis and Butler complained that Teachers refused to deal directly with them; that everything had to be done through Sonnenblick-Goldman.

21. Kassis Affid. ¶ 6; Butler Affid. ¶ 16.

negotiations on behalf of the defendants in New York, Teachers is estopped from contending that the loan was arranged and negotiated in New York. Here they rely on a declaration signed by Sidney Wallis, then President of Sonnenblick-Goldman Corp. of California, a California corporation, which is a subsidiary of Sonnenblick-Goldman of New York.

The declaration was intended to comply with a provision in the Commitment Letter that OCCA, as the borrower, was to furnish "evidence satisfactory to us, [Teachers] that this loan was 'arranged for' us (within the meaning of such terms as contained in Article XV of the California Constitution) by Sonnenblick-Goldman Corp., a licensed California real estate broker." [22] As early as January 24, 1984, Teachers' representatives wrote to OCCA (again addressed c/o Sonnenblick-Goldman Corp. in New York City), reminding it of various items required to conclude the matter at the time of closing, including "a declaration (in the attached form) to be executed by Sonnenblick-Goldman Corp." [23] The form had blank spaces that were to be filled in with the required information. The purpose of the declaration was to indicate compliance with California's law relative to allowable interest rates.

The blank form was submitted by OCCA to Sonnenblick-Goldman for completion and the declaration was prepared jointly by Wallis and Robert Sonnenblick. It was delivered some four days before the closing to an escrow holder in contemplation of its use upon the closing as one of the documents required to consummate the transaction. It is this declaration upon which the defendants rest their plea of estoppel. Among other matters, it states that Sonnenblick-Goldman Corp. of California, a licensed California real estate broker arranged the loan between Teachers and OCCA, for which it was to receive a fee of 1%; that it was primarily involved in arranging the loan; and that Robert Sonnen-

blick contacted numerous lenders before determining that Teachers would offer the most advantageous terms. Thus the defendants contend that Teachers "represented" as a condition of the loan that it was the California corporation and not the New York corporation that "brokered" the loan and rendered the substantive services which were performed in California. [24]

At the outset it is noted that Teachers did not sign the declaration. Teachers' representatives, including its General Counsel in charge of drafting the documents, who forwarded the blank declaration form for execution, swear it was to be executed by the New York corporation; that its execution by a California subsidiary of Sonnenblick-Goldman was never discussed nor considered; that they did not know a separate entity, Sonnenblick-Goldman of California, ever existed; that the Commitment Letter required a declaration that Sonnenblick-Goldman, the New York corporation, was a registered California real estate broker; that prior to the closing they never saw the declaration; that the Butler group never submitted the document for review, nor were they asked to pass upon its language. Thus it appears that the defendants seek to support their claim of estoppel upon a document not signed by the plaintiff, the contents of which were prepared by a third party and of which it was without knowledge.

While at this stage of the proceeding the Court does not resolve the ultimate issue, the position of the plaintiff is not without considerable force and substance. In any event, whatever the merits of the issue, the declaration cannot alter basic facts. No matter what is stated in the declaration, it cannot overcome the historical fact of the extensive activities in New York by Sonnenblick-Goldman, the New York corporation previously alluded to. The claim of estoppel cannot in the light of the facts prevail on this motion.

---

**22.** Plaintiff's Deposition Ex. 1.

**23.** Plaintiff's Deposition Ex. 65 at 2.

**24.** Kassis Affid. ¶ 15.

In sum, upon the record presented, the evidence is compelling that Sonnenblick-Goldman's activities in New York on behalf of the defendants and upon their express authorization which resulted in the Commitment Letter are more than adequate to sustain in personam jurisdiction over the defendants. Accordingly, the motion to dismiss for lack of personal jurisdiction is denied.

## MOTION TO TRANSFER PURSUANT TO
## 28 U.S.C. § 1404(a)

■■■■ Defendants move in the alternative to transfer this action pursuant to 28 U.S.C., section 1404(a), to the Eastern District of California. Section 1404(a) provides that a district court may transfer any civil action to any other district where the action might have been brought, "[f]or the convenience of the parties and witnesses," and in the "interest of justice."[25] Defendants bear the burden of establishing the propriety of a transfer.[26] To determine whether defendants have satisfied that burden, the following factors are pertinent:

(1) the convenience to parties; (2) the convenience of witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems indicating where the case can be tried more expeditiously and inexpensively; and (7) the interests of justice, a term broad enough to cover the particular circumstances of each case, which in sum indicate that the administration of justice will be advanced by a transfer.[27]

■■■■ Defendants contend that a California forum would be appreciably more convenient because they conduct business there; the principal negotiations took place in California; material witnesses reside in California who cannot be compelled to testify in New York; documents concerning the transactions are located in California; and a New York trial would seriously disrupt their substantial ongoing investment activities.

In opposition, Teachers vigorously challenges defendants' oft-repeated statement that the principal negotiations took place in California. Additionally, it presses the very grounds of inconvenience advanced by the defendants in urging the transfer of the action to California. Plaintiff stresses its claim that all the substantial negotiations concerning the contract took place in New York; that it conducts an extensive business there and that a California trial would disrupt those business operations since it functions with a small staff; that the documents concerning the transaction are located in New York; and that material non-party witnesses reside in New York who cannot be compelled to testify in California.

Upon considering the parties' contentions in the light of the factors enumerated under the *Schneider v. Sears,*[28] Court finds that the inconvenience to the parties and witnesses is evenly balanced. No matter where the trial is held, one party or the other will be inconvenienced. Butler and Kassis, OCCA's primary witnesses, are California residents. It may be assumed that as general partners of OCCA and vitally interested in the outcome of this suit, they will appear and testify at the trial, whether it be held in New York or Sacramento. This is also true of Teachers' primary witnesses, Sullivan and Lohr, who reside and work in the New York area. Similarly, it may be assumed that Teachers' other witnesses, who are knowledgeable with respect to matters touching upon the defendants' claim of alleged estoppel and other matters, would testify at a trial whether conducted in this District or in California. So, too, Robert Sonnenblick, it appears, is a

---

**25.** 28 U.S.C. 1404(a) (1982).

**26.** *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978).

**27.** *Schneider v. Sears,* 265 F.Supp. 257, 263 (S.D. N.Y.1967).

**28.** 265 F.Supp. 257 (S.D.N.Y.1967).

likely witness at the trial, no matter where conducted.

A principal and key witness is Stern. He is a New York resident, beyond the subpoena power of the federal courts in Sacramento. There is no indication that Stern will voluntarily attend a trial in Sacramento. With the basic issues so sharply drawn, the live testimony of material witnesses, particularly Stern, is desirable.[29]

Defendants' contention that their material witnesses who cannot be compelled to testify in New York outnumber plaintiff's witnesses who cannot be compelled to testify in California is without basis. In making this claim the defendants refer to witnesses at the abortive closing who were not otherwise materially involved in or played any role in events leading to the financial agreement. The most these witnesses can testify to is that a dispute arose at the closing concerning the prepayment provision, as a result of which the financing was not consummated. The basis of the dispute cannot be challenged; indeed, it is at the hard core of the instant case. The testimony as to what occurred at the closing session clearly is available through defendants' principals who were present to execute the required papers.

As to documents, both plaintiff's and defendants', these can readily be transported or copies made, and present no problem of substance. Indeed, there is now before the Court practically every document that the parties rely upon to establish their respective claims.

Upon considering and weighing the parties' contentions with respect to the factors enumerated under *Schneider v. Sears*,[30]

the Court finds that defendants have not borne their burden of showing that the "proposed transferee court is a more convenient one and that the interests of justice would be better served there." [31] To the contrary, the Court further finds that the inconvenience to the parties and witnesses is evenly balanced. No matter where the trial is held, one party will be inconvenienced. Where the factors involved in the Court's decision whether or not to transfer are in equipoise, the plaintiff is entitled to his choice of forum.[32] Accordingly, defendants' motion to transfer this action to the Eastern District of California is denied.

## LIS PENDENS

Defendants move to expunge a lis pendens recorded on the property at issue here pursuant to California Code of Civil Procedure, section 409. Section 409 provides that a lis pendens may be recorded in any "action concerning real property or affecting the title or the right of possession of real property." [33] The parties' principal dispute with respect to defendants' motion to expunge is whether plaintiff has stated a claim affecting "the right of possession of real property."

Plaintiff contends that in seeking relief in the form of specific performance, it necessarily states a claim affecting the right of possession of real property. Plaintiff bases its claim to specific performance on two provisions of the Commitment Letter: (1) granting Teachers 40% of the operating income of the proposed building over a thirty-five year period; and (2) assigning the deed of trust in connection with the closing of the loan. Plaintiff asserts that

---

**29.** *See EMI Ltd. v. Picker Int'l Inc.*, 565 F.Supp. 905, 907 (S.D.N.Y.1983); *Oil and Gas Ventures-First 1958 Fund, Ltd. v. Kung*, 250 F.Supp. 744, 756 & n. 48 (S.D.N.Y.1966); *see also Lago Oil & Transport Co. v. United States*, 97 F.Supp. 438, 439 (S.D.N.Y.1951).

**30.** 265 F.Supp. 257 (S.D.N.Y.1967).

**31.** *Schneider v. Sears*, 265 F.Supp. 257, 263 (S.D.N.Y.1967); *see also Trafalgar Capital Corp. v. Oil Producers Equip. Corp.*, 555 F.Supp. 305 (S.D.N.Y.1983).

**32.** *Trafalgar Capital Corp. v. Oil Producers Equip. Corp.*, 555 F.Supp. 305, 314 (S.D.N.Y. 1983); *Bastille Properties, Inc. v. Hometels of Am. Inc.*, 476 F.Supp. 175, 182 (S.D.N.Y.1979); *American Contract Designers Inc. v. Cliffside, Inc.*, 458 F.Supp. 735, 740 (S.D.N.Y.1978).

**33.** Cal.Civ.Proc.Code § 409 (West 1973 & Supp. 1983–84).

the difficulty of assessing the damages incurred if the agreement is not carried through combined with its contractual right to the deed of trust entitle it to specific performance. Defendants urge, however, that specific performance is unavailable where plaintiff seeks to recover for breach of a loan agreement. Plaintiff's sole remedy, argue the defendants, is money damages.

 The Court need not choose between plaintiff's and defendants' arguments with respect to the conditions under which a remedy of specific performance is available. The California lis pendens statutes provide the Court with broad discretion in requiring an undertaking to take the place of a lis pendens.[34] Section 409.2 of the California Code of Civil Procedure states:

> At any time after notice of pendency of an action has been recorded pursuant to Section 409 or other law, the court in which the action is pending may order that the notice be expunged if the moving party shall have given an undertaking of such nature, in such amount and within such time as shall be fixed by the court after notice and hearing, such undertaking to be to the effect that the moving party will indemnify the party recording the notice for all damages which he may incur if the notice is expunged and the moving party does not prevail and if the court finds that adequate relief can be secured to the party recording the notice by the giving of such undertaking.[35]

 The Court questions whether a lis pendens is in the interests of either party in this case. Defendants correctly contend that the lis pendens may prevent the consummation of an outstanding financing arrangement [36] and in turn may trigger a foreclosure proceeding by the Bank of America, which made the construction loan and has served or is about to serve notice to that effect. Plaintiff has offered no valid reason why a security bond as opposed to a lis pendens will not safeguard its interests. Irrespective of the specific performance issue, where the interest of the party recording the lis pendens is primarily in the income produced from the real property at stake, the Court is soundly within its discretion under California law in requiring a bond sufficient to provide adequate relief to that party.[37] Moreover, continuing the lis pendens may be self defeating. Obviously if it remains on record, the new lender will not advance funds, with the result that the Bank of America will proceed with its foreclosure, which, depending upon the bidding price, may wipe out the equity of OCCA and any right of plaintiff in the property. In the interests of the parties, and of avoiding a "mini-trial" on the merits,[38] the lis pendens may be expunged upon the defendants posting a bond in the amount of $600,000. This bond, combined with the $400,000 commitment fee currently retained by the plaintiff, is adequate to protect plaintiff's interests.[39] Defendants' motion to expunge the lis pendens is granted upon the posting of a $600,000 bond.

So ordered.

---

34. *See Sheets v. Superior Court,* 86 Cal.App.3d 68, 149 Cal.Rptr. 912, 914 (1978).

35. Cal.Civ.Proc.Code § 409.2 (West 1973 & Supp.1983–84).

36. This commitment, which expires September 7, 1984, was obtained after the agreement here at issue was not consummated.

37. *See Coppinger v. Superior Court,* 134 Cal. App.3d 883, 185 Cal.Rptr. 24 (1982) (where party recording the lis penden's sole interest in the property was purely monetary and an undertaking would be adequate to secure relief, it was an abuse of discretion to deny a § 409.2 motion); *Empfield v. Superior Court,* 33 Cal.App.3d 105, 108 Cal.Rptr. 375 (1973) (same).

38. *Malcolm v. Superior Court,* 29 Cal.3d 518, 174 Cal.Rptr. 694, 700, 629 P.2d 495 (1981).

39. The amount of the undertaking is a matter for the Court's discretion. *See Coppinger v. Superior Court,* 134 Cal.App.3d 883, 185 Cal.Rptr. 24, 30 (1982).