MORSE TYPEWRITER CO.,
INC., Plaintiff,

v.

SAMANDA OFFICE COMMUNICA-
TIONS LTD., G. Richard Cook,
and Northern Telecom Ltd., Defendants.

No. 84 Civ. 7524 (EW).

United States District Court,
S.D. New York.

March 11, 1986.

Solin & Breindel, New York City, for plaintiff; Howard R. Reiss, of counsel.

Gelberg & Abrams, New York City, for defendant Northern Telecom Ltd.; Michael D. Hess, Michael Luskin, Liza A. Bosworth, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Morse Typewriter Co. ("Morse") commenced this diversity action in October 1984 against three defendants: Samanda Office Communications Ltd. ("Samanda"), G. Richard Cook and Northern Telecom Ltd. ("NTL"). The action arises from Samanda's sale to Morse beginning in May 1984 of Intelligent Remote Input Stand ("IRIS") equipment designed to enable certain typewriters to provide word processing functions. In essence, Morse alleges that the IRIS units it purchased did not perform as they should have and it asserts causes of action for breach of express and implied warranties and negligent and intentional misrepresentation against Samanda, from which it purchased the units directly, Cook, Samanda's vice presi-

dent in charge of marketing, and NTL, which allegedly developed the IRIS, licensed it to Samanda, and sold its IRIS inventory to Samanda.

Plaintiff is a New York corporation with its principal place of business in New York City; Samanda and NTL are Canadian corporations with their principal places of business in Ontario, Canada. Cook is a Canadian resident. On February 15, 1985, this Court granted Morse's motion for a default judgment against Samanda, which is presently in bankruptcy receivership in Canada where its assets are being liquidated under the receiver's supervision.

NTL moves pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss the action against it upon the ground that the Court lacks in personam jurisdiction over it or, alternatively, under the doctrine of forum non conveniens. Morse argues that jurisdiction exists on any of three separate grounds: (1) NTL is "doing business" in New York through its American subsidiary, Northern Telecom, Inc. ("NTI") within the meaning of N.Y.Civ.Prac.Law § 301; (2) NTL "transacted business" in New York within the meaning of New York's long arm statute, Civ.Prac.Law § 302(a)(1); and (3) NTL committed a "tortious act without the state causing injury to person or property within the state," within the meaning of the long arm statute, Civ.Prac.Law § 302(a)(3).

## BURDEN OF PROOF

On this motion to dismiss the complaint, plaintiff has the burden of establishing this Court's in personam jurisdiction over the defendant.[1] This Court granted discovery limited to the jurisdictional questions posed by NTL's motion, but did not conduct a full blown evidentiary hearing. "In the absence of a full blown evidentiary hearing on the merits, plaintiff on this motion, through its own affidavits and supporting materials, need only make a prima facie case that the Court has jurisdiction over the defendant[ ]." [2] Such a prima

1. See Singer v. Bell, 599 F.Supp. 350, 353 (S.D.N. Y.1984).

2. Teachers Ins. & Annuity Ass'n of America v. Butler, 592 F.Supp. 1097, 1099 (S.D.N.Y.1984); see also Volkswagenwerk Aktiengesellschaft v.

facie showing does not relieve Morse of its burden of establishing in personam jurisdiction at trial by a fair preponderance of the evidence.[3]

### DOING BUSINESS—C.P.L.R. § 301

Under section 301, N.Y.Civ.Prac.Law, NTL is subject to the Court's in personam jurisdiction if, at the time the action was commenced, it was " 'engaged in such a continuous and systematic course of "doing business" [in New York] as to warrant a finding of its "presence" in this jurisdiction.' " [4] NTL must be found to have been "present" in New York, not " 'occasionally or casually, but with a fair measure of permanence and continuity' " so that it is reasonable and just to require it to defend an action in New York.[5]

Morse does not claim that NTL itself is doing business in New York. Indeed, NTL asserts, and Morse does not dispute, that NTL is not doing business and is not licensed to do business in New York; that it has no offices, employees, telephone listings, mailing addresses or leased properties in New York and does not manufacture, sell or warehouse goods in New York. Equally undisputed is that NTI, NTL's American subsidiary, is doing substantial business in New York.[6] Accordingly, Morse claims as a result of the activities of the subsidiary in New York and the relationship between the two corporations, NTL is doing business in New York and is subject to the Court's in personam jurisdiction. Morse asserts that this relationship creates jurisdiction over NTL in either of two ways: NTL is a "corporate shell" that conducts no business of its own and NTI, the subsidiary, is a "mere department" of NTL.

■ In *Bellomo v. Pennsylvania Life Co.*,[7] the Court held that a parent corporation is "doing business" if the parent is a mere "corporate shell" that conducts no business of its own, independent of its subsidiaries. Here, the facts show that while NTL conducts most of its business through its various subsidiaries, it cannot be characterized as a holding company or shell. NTL conducts venture capital and licensing activities in connection with the development of new technology which amount to approximately $14 million (Canadian). NTL invested in Samanda, acquiring a 15% minority stock interest and entered into licensing agreements with Samanda. Until May 1985, NTL had its own data systems division which in 1984 yielded revenues of approximately $50 million. Morse's conclusory assertions to the contrary do not establish a prima facie case of jurisdiction under the *Bellomo* decision.

■ The second argument raised by Morse to support its contention that NTL is doing business in New York is that under our Court of Appeals' decision in *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,[8] NTI is a "mere department" of NTL. In *Volkswagenwerk*, the

---

Beech Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984); *Mayes v. Leipziger*, 674 F.2d 178, 182 n. 3 (2d Cir.1982); *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981); *Visual Sciences, Inc. v. Integrated Communications Inc.*, 660 F.2d 56, 58 (2d Cir.1981).

**3.** *See Marine Midland Bank*, 664 F.2d at 904; *Visual Sciences*, 660 F.2d at 58; *Teachers Ins. & Annuity Ass'n*, 592 F.Supp. at 1099.

**4.** *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981) (quoting *Simonson v. International Bank*, 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427, 429 (1964)). *See also Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983); *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851,

cert. denied, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967).

**5.** *Laufer v. Ostrow*, 55 N.Y.2d 305, 310, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (1982) (quoting *Tauzu v. Susquehanna Coal Co.*, 220 N.Y. 259, 268, 115 N.E. 916, 917 (1917)). *See also Hofritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985).

**6.** NTI's activities are not confined to New York. The corporation's principal place of business is Tennessee and its total revenues in the United States exceeded $2 billion in 1984.

**7.** 488 F.Supp. 744 (S.D.N.Y.1980).

**8.** 751 F.2d 117 (2d Cir.1984).

Court set forth four factors to guide the determination of whether personal jurisdiction over a parent corporation exists under section 301 by virtue of the activities of its subsidiary in New York. The first of these factors, common ownership, is not in dispute. NTI, the American subsidiary, is wholly-owned by NTL. The remaining three factors are: (1) financial dependency of the subsidiary on the parent corporation; (2) the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (3) the degree of the parent's control over the subsidiary's marketing and operational policies.[9]

In *Volkswagenwerk*, the subsidiary was "wholly dependent upon [the parent's] financial support to stay in business."[10] The parent had extended credit to the subsidiary in excess of the latter's cash balances and had provided a $400,000 no-interest loan with no payment date. In contrast, the evidence before this Court establishes that NTI is a large, self-sustaining corporation that does not depend for its existence on the financial support of its parent, defendant NTL. In 1984, NTI's revenues throughout the United States totalled $2.2 billion. The company enters into its own supply contracts, pays for its own product advertising and issues its own commercial paper. While NTL made two loans to NTI in 1984 totalling $240 million, both loans were at competitive market interest rates. Moreover, NTI, along with the other Northern Telecom subsidiaries, pays a percentage of its revenues to NTL pursuant to a research and development cost sharing agreement. In sum, NTI stands on its own two feet financially and does not receive benefits from NTL for which it does not pay its fair share.

The next factor the Court must weigh is the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities. Two of the three members of NTI's board of directors are NTL officers.[11] As the Second Circuit recently noted, "[o]f course, the officers of a parent normally control the board of directors of a subsidiary in their capacity as representatives of the controlling stockholder."[12] But more must be shown to establish that the subsidiary is not an independent entity.[13] Here, that proof is lacking.

Unlike the officers of the subsidiary in *Volkswagenwerk*, none of the officers of NTI are officers of NTL nor is there any evidence that their salaries are paid by the parent. There is no evidence that NTL appoints any of NTI's executives other than its president.

While NTL has promulgated standardized procedures for effecting transfers between the subsidiaries, the evidence does not show that NTL determines which executives will be transferred or where they will be transferred. In fact, it appears that a subsidiary seeking to hire an executive of another subsidiary must negotiate with that person and the present employer.[14] Plaintiff cites examples of NTL executives being loaned to subsidiaries *other than NTI*. However, this does not support plaintiff's allegation that NTL controls NTI, the only subsidiary doing business in New York. Finally, there is no evidence, as there was in *Volkswagenwerk*, that the parent disregards the corporate formalities of NTI.

The final factor the Court must weigh is the degree of NTL's control over NTI's marketing and operational policies. NTI's president reviews with the parent's president NTI's annual budget and its monthly

9. *Id.* at 120–22.

10. *Id.* at 121.

11. *See* Caffry Deposition, tr. at 51.

12. *Volkswagenwerk*, 751 F.2d at 121.

13. *Id.; see also In re Puerto Rico Air Disaster Litigation*, 340 F.Supp. 492, 496 (S.D.N.Y.1972).

14. *See* Badelt Deposition, tr. at 18–20; Caffry Deposition, tr. at 53–55; NTL Confidential Documents Nos. 00846–00864.

performance. NTI must obtain the approval of NTL's president for capital expenditures and research and development investments exceeding $2 million; NTL's board of directors must approve all such expenditures exceeding $2.5 million.[15] However, this is not sufficient by itself to sustain an allegation of control by the parent and must be evaluated against the totality of the evidence with respect to NTI's relationship to NTL.

NTI's president makes the preponderance of the decisions regarding NTI's operations; not only those concerning day-to-day operations, but "much more than that."[16] There is evidence that NTI's executives keep their NTL counterparts informed, but not that the NTL executives exercise control over NTI operations. For example, NTI enters into its own sales and supply contracts[17] and all product advertising in the United States is originated, developed and placed by NTI.[18] NTI has its own manufacturing, research, sales, distribution, service and support facilities and staff.[19] NTL promulgates corporate policies that apply to itself and all subsidiaries, but NTI adopts its own procedures and some interim policies.[20]

In sum, it appears that NTI exercises substantial discretion and independence within broad parameters established by its parent. NTI's relationship with NTL primarily is one in which the subsidiary keeps the parent informed of its performance and plans, with express approval required only for major expenditures. Unlike the relationship in *Volkswagenwerk*, NTL does not control "virtually every aspect of [NTI's] marketing efforts."[21] To the contrary, it appears that NTL's basic policy as to marketing and operational matters has been to distance itself from NTI and that NTI is an independent entity.

After weighing all of the factors, the Court finds that plaintiff has failed to allege facts sufficient to establish a prima facie case of in personam jurisdiction over NTL under the "doing business" doctrine. The Court does not find that NTI is a "mere department" of NTL[22] and thus declines to attribute NTI's activities in New York to NTL.

## TRANSACTING BUSINESS

█ Morse further alleges that there is long-arm jurisdiction under section 302(a)(1)[23] because of NTL's involvement in the negotiation, sale and delivery of IRIS equipment to Morse in New York. To support this allegation, Morse asserts that NTL manufactured many of the IRIS units delivered to Morse; an NTL employee, Badelt, made representations to Morse in Dallas, Texas, that induced Morse to purchase the units from Samanda; an NTL employee

---

**15.** *See* Caffry Deposition, tr. at 8.

**16.** *See* Caffry Deposition, tr. at 20–21.

**17.** *See* Caffry Deposition, tr. at 69–70; Defendant's Answers to Jurisdictional Interrogatories, No. 19.

**18.** NTL places "image" advertisements in United States newspapers and periodicals to promote the Northern Telecom logo, a registered trademark of NTL that is used by NTI in accordance with United States trademark law. *See* 15 U.S.C. § 1055. NTI pays for these advertisements and they are intended to benefit NTI, not NTL. *See* Defendant's Answers to Jurisdictional Interrogatories, Nos. 24–25.

**19.** *See* Affidavit of Lafleur, ¶ 4.

**20.** *See* Defendant's Answers to Jurisdictional Interrogatories, No. 6.

**21.** 751 F.2d at 122.

**22.** *See Saraceno v. S.C. Johnson & Son, Inc.,* 83 F.R.D. 65, 68–71 (S.D.N.Y.1979); *Marantis v. Dolphin Aviation, Inc.,* 453 F.Supp. 803, 805 (S.D.N.Y.1978); *see also Delagi v. Volkswagenwerk AG of Wolfsburg,* 29 N.Y.S.2d 426, 432, 328 N.Y.S.2d 653, 657, 278 N.E.2d 895, 897–98 (1972); *Public Administrator v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967); *Taca Int'l Airways v. Rolls-Royce,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965).

**23.** Section 302(a)(1) provides: "[A] court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y.Civ.Prac.Law § 302(a)(1) (McKinney Supp.1986).

conducted training sessions for Morse employees at NTL offices in Ontario, Canada; and NTL "played an important role in determining how Samanda marketed the IRIS in New York."[24]

However, NTL asserts and Morse does not dispute that NTL did not enter into any contracts with Morse and that Morse made no payments to NTL. NTL sold the IRIS units to Samanda in Canada in connection with the acquisition of shares in Samanda. Samanda, not NTL, sold the units to Morse. Further, NTL expressly directed Samanda not to use NTL's name in connection with the sale of the units and Samanda agreed to abide by that instruction.[25] The alleged representations by Badelt occurred in Dallas, Texas, after Morse and Samanda entered into their contract. Because NTL neither transacted business in New York nor contracted to supply goods in New York, the Court finds that NTL is not subject to jurisdiction under section 302(a)(1).

Although not alleged by Morse, the Court also must consider whether Samanda acted as NTL's agent in selling the IRIS equipment to Morse. For purposes of section 302(a)(1), an agency relationship is defined broadly and need not involve a formal agency arrangement. As this Court has explained, to constitute an agent for the purposes of the statute, the alleged agent must have engaged in purposeful activities in New York for the benefit of and with the knowledge and consent of the non-domiciliary and the non-domiciliary must exercise some element of control over the agent.[26] Put another way,

the activities of a representative of a non-domiciliary in New York will be attributed to the non-domiciliary for the purpose of long-arm jurisdiction if the non-domiciliary requested the performance of those activities in New York, and those activities benefit it, regardless of whether the representative acted as an agent or an independent contractor.[27]

Morse alleges that Samanda was formed by former NTL employees; NTL contributed capital to Samanda and owned some of its stock; and NTL staffed Samanda's board and officer positions with former NTL employees and with NTL employees on leaves of absence. Based on these allegations, Morse concludes that "NTL financed Samanda and used Samanda to dispose of its IRIS product and inventory."[28]

While these allegations permit a reasonable inference that Samanda's sale to Morse may have benefitted NTL, they do not support an inference, nor does plaintiff allege, that NTL requested or directed Samanda to sell the IRIS units to Morse. NTL acquired only a 15% non-controlling interest in Samanda.[29] Upon its acquisition of its shares of Samanda, NTL transferred its IRIS inventory to Samanda but did not designate Samanda to act as its agent. In fact, NTL prohibited Samanda from using its name in connection with the IRIS or from representing that NTL endorsed Samanda's IRIS products.

**24.** Plaintiff's Memorandum of Law in Opposition, at 11.

**25.** *See* Affidavit of Herpers, at ¶ 6; Defendant's Reply Memorandum of Law, Exh. C.

**26.** *Louis Marx & Co. v. Fuji Seiko Co.,* 453 F.Supp. 385, 390 (S.D.N.Y.1978). *See also Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981); *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1530 (S.D.N.Y.1985); *Teachers Ins. & Annuity Ass'n of America v. Butler,* 592 F.Supp. 1097, 1101 (S.D.N.Y.1984); *Selman v. Harvard Medical School,* 494 F.Supp. 603, 611 (S.D.N.Y.), *aff'd mem.,* 636 F.2d 1204 (2d Cir.1980); *Plaza Realty Investors v. Bailey,* 484 F.Supp. 335, 347 (S.D.N.Y.1979).

**27.** *Cato Show Printing Co. v. Lee,* 84 A.D.2d 947, 446 N.Y.S.2d 710, 713 (4th Dep't 1981). *See also Como v. Commerce Oil Co., Inc.,* 607 F.Supp. 335, 340 (S.D.N.Y.1985); *Dero Enterprises, Inc. v. Georgia Girl Fashions,* 598 F.Supp. 318, 322 (S.D.N.Y.1984); *Teachers Ins. & Annuity Ass'n of America v. Butler,* 592 F.Supp. 1097, 1102 (S.D.N.Y.1984); *Abbate v. Abbate,* 82 A.D.2d 368, 441 N.Y.S.2d 506, 515–16 (2d Dep't 1981); *East New York Savings Bank v. Republic Realty Mortgage Corp.,* 61 A.D.2d 1001, 402 N.Y.S.2d 639, 641 (2d Dep't 1978).

**28.** Affidavit of Morse, at ¶ 5.

**29.** *See* Affidavit of Herpers, ¶ 5.

The only allegations connecting NTL to the sale to Morse are the representations by Badelt in Dallas, Texas, and the training sessions conducted in NTL offices in Canada. The representations by Badelt, however, because they occurred after the sale to Morse was consummated cannot be considered evidence that Samanda sold IRIS units to Morse at NTL's request.[30] Similarly, the use of NTL's offices in Canada, at Samanda's request, to train Morse personnel—the only place IRIS units were being used at the time—does not create an inference that NTL requested or directed Samanda to sell units to Morse.

Ultimately, the question is whether the relationship between NTL and Samanda is such that it is fair to say that NTL "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[31] While it appears that NTL, as a shareholder of Samanda, may have benefitted from the sale to Morse, just as all stockholders benefit from a profitable contract, plaintiff's allegations do not give rise to an inference that Samanda was controlled by NTL or that Samanda's decision to sell to Morse in New York was not an autonomous act. Morse has not made out a prima facie case of an agency relationship.

## TORTIOUS ACT WITHOUT THE STATE

■ Morse's final argument for personal jurisdiction is that NTL committed a tort outside New York causing injury within the state. Morse contends that the alleged misrepresentations by Badelt at the Dallas, Texas, trade show regarding NTL's commitment to Samanda's sale of the IRIS units subject NTL to this Court's jurisdiction.

Under section 302(a)(3), long-arm jurisdiction exists as to an action arising from (1) a tortious act committed outside New York (2) causing injury to person or property within the state, provided that the tortfeasor *either* (3) regularly does or solicits business, engages in persistent conduct, or derives substantial revenue from goods or services consumed in New York or (4) expects or should reasonably expect the tortious act to have consequences in New York and derives substantial revenue from interstate or international commerce.[32]

A fraudulent misrepresentation made in connection with contract negotiations, if relied upon, can be a "tortious act without the state," satisfying the first element of the statute.[33] However, Morse has failed to allege facts in its complaint or in its affidavits to support a reasonable inference that the second element, tortious injury within the state, is present. As set forth in this Court's opinion in *Aaacon Auto Transport, Inc. v. Barnes*,[34] the mere fact that the injured party is domiciled in New York and sustains financial loss does not make New York the situs of the injury, at least in cases involving commercial torts.[35]

**30.** *See Cato Show Printing,* 446 N.Y.S.2d at 713.

**31.** *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). *See Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 766 (2d Cir.1983); *Mayes v. Leipziger,* 674 F.2d 178, 183 (2d Cir.1982); *George Reiner & Co. v. Schwartz,* 41 N.Y.2d 648, 651, 394 N.Y.S.2d 844, 846, 363 N.E.2d 551, 553 (1977); *Ford v. Unity Hospital,* 32 N.Y.2d 464, 471, 346 N.Y.S.2d 238, 243, 299 N.E.2d 659, 663 (1973); *McKee Electric Co. v. Rauland-Borg Corp.,* 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 37–38, 229 N.E.2d 604, 606–08 (1967); *Island Wholesale Wood Supplies, Inc. v. Blanchard Indus., Inc.,* 101 A.D.2d 878, 476 N.Y. S.2d 192, 194–95 (2d Dep't 1984).

**32.** N.Y.Civ.Prac.Law § 302(a)(3) (McKinney 1972).

**33.** *See Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 899 (2d Cir.1980).

**34.** 603 F.Supp. 1347 (S.D.N.Y.1985).

**35.** *Id.* at 1349–50; *see also American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.,* 439 F.2d 428, 432–35 (2d Cir.1971); *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1529 n. 5 (S.D.N.Y.1985); *Trafalgar Capital Corp. v. Oil Producers Equipment,* 555 F.Supp. 305, 311–13 (S.D.N.Y.1983); *Mije Assocs. v. Halliburton Servs.,* 552 F.Supp. 418, 420–21 (S.D.N.Y.1982); *Dogan v. Harbert Const. Corp.,* 507 F.Supp. 254, 262 (S.D.N.Y.1980).

There must be an allegation that the misrepresentation was made in New York, or was received and relied upon in New York, or that as a result thereof the plaintiff lost business in New York.[36] Here, the alleged misrepresentations were made and received in Dallas, Texas. In 1984, Morse and its subsidiaries had revenues of approximately $20 million, primarily from sales of typewriters throughout the eastern third of the United States.[37] Morse does not allege in its complaint or in its affidavits that it lost business in New York as a result of the alleged misrepresentations. Therefore, the Court lacks jurisdiction under section 302(a)(3).

## CONCLUSION

Morse has not carried its burden of alleging facts to support a prima facie case of in personam jurisdiction. Accordingly, NTL's motion to dismiss the complaint is granted.[38]

So ordered.

---

**36.** *See Aaacon Auto Transport,* 603 F.Supp. at 1349–50; *see also Roddy v. Schmidt,* 57 N.Y.2d 979, 982, 457 N.Y.S.2d 234, 235, 443 N.E.2d 482, 483 (1982).

**37.** *See* Jonathan Morse Deposition, tr. at 13, 22–23.

**38.** Defendant also moved to dismiss the action in favor of the Canadian courts under the doctrine of *forum non conveniens.* In view of the Court's disposition of defendant's motion pursuant to Rule 12(b)(2), the Court need not reach this question.