**Eddie PALMIERI, Plaintiff,**

**v.**

**Gloria ESTEFAN, et al., Defendants.**

**No. 91 Civ. 3098 (LBS).**

United States District Court,
S.D. New York.

May 18, 1992.

Goodkind, Labaton & Rudoff, New York City (Brian D. Caplan, of counsel), for plaintiff.

Weil, Gotshal & Manges, New York City (Robert G. Sugarman, Robin E. Silverman, Gerald Padian, of counsel), for the moving defendants.

## OPINION

SAND, District Judge.

In this action for copyright infringement, the plaintiff, Eddie Palmieri, alleges that in 1981 he wrote and recorded a song "Paginas De Mujer," to which he holds the copyright, and which was released in the United States by Barbaro Records the same year. Defendants Estefan, Casa and Ostawald claim that they composed the song "Oye Mi Canto," in 1989. Plaintiff alleges that "Oye Mi Canto" infringes on his copyright to "Paginas De Mujer," and that "Oye Mi Canto" was commercially exploited by

Sony Music Entertainment Inc. (hereinafter "Sony Music") in the United States and by its affiliates abroad. On May 7, 1991, plaintiff filed this action, and in August of 1991, this Court granted the parties the opportunity to conduct jurisdictional discovery. Thirty-three foreign affiliates of Sony Corporation of Japan (hereinafter "Sony Corp.") that have been named as defendants in this action (hereinafter "the moving defendants") have now moved to dismiss the amended complaint for lack of personal jurisdiction pursuant to Fed. R.Civ.P. 12(b)(2).[1]

## JURISDICTIONAL FACTS

Sony Music, the successor in interest to CBS Records Inc. (hereinafter "CBS Records"),[2] is a record company which produces, manufactures and distributes recordings. *See* Transcript of Deposition of Stuart Bondell, Vice President of Business Affairs of Sony Music at 23, attached as Exhibit B to Affidavit of Brian Caplan, attorney for plaintiff (hereinafter "Bondell Dep."). Sony Corp. owns Sony Music and other entities, which in turn own the moving defendants.[3]

The moving defendants argue that they are not subject to jurisdiction in the Southern District of New York. Each moving defendant alleges that it is incorporated under the laws of a country other than the United States and operates under the laws of the country in which it is located. *See* Affiliate Affs. at ¶ 2.[4] Each moving defendant alleges that it maintains an office only within its own territory and that it produces, manufactures and distributes musical recordings only within this territory. *See* Affidavit of Stuart Bondell, Vice President of Business Affairs of Sony Music, ¶ 3 (hereinafter "Bondell Aff."); Affiliate Affs. ¶ 3.[5] No moving defendant maintains an office or telephone number in New

1. While the Defendants' Memorandum of Law in Support of Motion to Dismiss for Lack of Personal Jurisdiction (hereinafter "Defendants' Mem. of Law") refers to thirty-four moving defendants, only thirty-three are listed in the Notice of Motion, and in the Rule 9 statement. The moving defendants are:

 Sony Music Entertainment (Argentina) S.A.I.F.
 Sony Music Entertainment (Australia) PTY. LTD.
 Sony Music Entertainment (Austria) GES. m.b.H.
 Sony Music Entertainment (Belgium) S.D./N.V.
 Sony Music Entertainment (Canada) Inc.
 Sony Music Entertainment (Chile) LTDA.
 Sony Music Entertainment (Colombia) S.A.
 Sony Music Entertainment (Costa Rica) INC.
 Sony Music Entertainment (Denmark) APS.
 Sony Music Entertainment (El Salvador) S.A.
 Sony Music Entertainment (Finland) OY
 Sony Music Entertainment (France) SA
 Sony Music Entertainment (Germany) G.M.B.H.
 Sony Music Entertainment (Greece) AEBE
 Sony Music Entertainment (Guatemala) S.A.
 Sony Music Entertainment (Holland) B.V.
 Sony Music Entertainment (Italy) S.P.A.
 Sony Music Entertainment (Kenya) LIMITED
 Sony Music Entertainment (Malaysia) SDN. BERHAD
 Sony Music Entertainment (Mexico) S.A.
 Sony Music Entertainment (New Zealand) LIMITED
 Sony Music Entertainment (Nigeria) LTD.
 Sony Music Entertainment (Norway) A/S
 Sony Music Entertainment (Panama) S.A.
 Sony Music Entertainment (Portugal) LTDA
 Sony Music Entertainment (Singapore) (PTE.) LTD.
 Sony Music Entertainment (Korea) INC.
 Sony Music Entertainment (Spain) S.A.
 Sony Music Entertainment (Sweden) A.B.
 Sony Music Inc. (BAAR)
 Sony Music Entertainment (Thailand) LTD.
 Sony Music Entertainment United Kingdom Limited
 Sony Music Entertainment (Venezuela) C.A.
 *See* Rule 9 Statement of Moving Defendants.

2. Sony Corp. bought CBS Records in 1988. *See* Affidavit of Marinus N. Henny, Senior Vice President of Sony USA Inc. ¶ 2 (hereinafter "Henny Aff.").

3. *See* Rule 9 Statement of Defendant Sony Music; Rule 9 Statement of the Moving Defendants; Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss, at 4 n. 3 (hereinafter "Plaintiff's Mem. of Law"). A detailed exposition of the ownership structure among the various moving defendants is provided in the Affidavit of Marinus N. Henny.

4. Officers of each of the moving defendants have submitted affidavits with identical paragraph structure, which will be hereinafter cited collectively as "Affiliate Affs.".

5. The territory of Sony Music Entertainment (Costa Rica) INC. also includes El Salvador, Guatemala and Panama.

York, and only one affiliate has a bank account here.[6] *See* Affiliate Affs. ¶¶ 4–5.

The moving defendants state that they sign contracts with local recording artists and release their recordings only in their respective countries. *See* Bondell Aff. ¶ 4; Affiliate Affs. ¶ 6.[7] They state that they are financially independent. *See* Bondell Aff. ¶ 3; Affiliate Affs. ¶¶ 7–8. Bondell concedes that as "the designee of the owner," he gives advice and assistance to the moving defendants in a small percentage of their contracts with recording artists. *See* Bondell Aff. ¶ 4. Bondell has assisted the affiliates in their negotiations with artists, as well as in the formulation of various business policies. *See* Bondell Dep. at 13–14. Some of the moving defendants' artists record in New York, and employees of the moving defendants occasionally accompany them on these trips. Sony Music's administration department has assisted the foreign affiliates with booking studio time in New York on some of these occasions. *See* Bondell Dep. at 60–61.

Each moving defendant made a "matrix" agreement with CBS Records, the predecessor of Sony Music. A matrix agreement grants each moving defendant the exclusive right to manufacture and distribute within its territory any recording in the repertoire of Sony Music and any other party to a matrix agreement with Sony Music. *See* Bondell Aff. ¶ 5; Affiliate Affs. ¶ 6. Each moving defendant in turn grants to Sony Music and any other party to a matrix agreement the exclusive right to manufacture and distribute within their respective territories any selection from that moving defendant's repertoire.

Each moving defendant has the power to decide whether to release a selection from Sony Music or another moving defendant's repertoire, and the matrix agreement does not obligate a moving defendant to do so.

If the moving defendant does decide to release a selection, it pays a fee to the moving defendant from whose repertoire the selection comes. *See* Bondell Aff. ¶ 6. According to defendants, any sales made by a moving defendant which derive from the rights acquired under a matrix agreement are made for that affiliate's own account and not on behalf of Sony Music or the affiliate from whose repertoire the selection originated. *See* Bondell Aff. ¶ 7. When both requesting and originating moving defendants are located in Europe, the fee is paid directly to the originating affiliate from the requesting affiliate. Otherwise, the requesting moving defendant pays the fee to Sony Music, which then pays the originating affiliate. In these cases, Sony Music provides the moving defendants with an accounting of the money owed to the affiliates. *See* Bondell Aff. ¶ 6.

The parties agree that the moving defendants earn profits from the sale of musical recordings obtained through the matrix agreements. Plaintiff claims that in the fiscal year ending January 31, 1991, a substantial percent of the moving defendants' profits were derived from rights granted in matrix agreements.[8] *See* Plaintiff's Mem. of Law at 5–6; Caplan Aff. ¶ 11. A significant percent of their profits were derived from recordings of artists signed directly to Sony Music in New York. According to plaintiff, this represents many millions of dollars of sales. Plaintiff also claims that the fees paid to moving defendants for sales by Sony Music in New York of recordings from their own territories "substantially contributed" to the moving defendants' royalty income of several million dollars in the fiscal year ending January 31, 1991. *See* Plaintiff's Mem. of Law at 6. However, the moving defendants dispute these figures. *See* Affidavit of Roger Romano, Controller of the International Divi-

---

6. One of the affiliates, Sony Music Entertainment (Mexico) S.A., does maintain accounts at a New York bank. *See* Defendants' Mem. of Law at 3 n. 5.

7. Sony Music Entertainment (Holland) B.V. does sign recording artists outside of Holland and employees of Sony Music sometimes negoti-

ate these contracts on behalf of this affiliate. *See* Bondell Aff. ¶ 4.

8. We refrain from citing specific percentages to accommodate the parties' confidentiality stipulation. The precise figures do not alter the legal analysis.

sion of Sony Music ¶¶ 2–8 (hereinafter "Romano Aff.").

Each affiliate maintains its own offices, bank accounts, and financial records. *See* Affiliate Affs. ¶ 7. Defendants state that each affiliate makes independent business decisions about the recordings it will produce and the manufacture of those recordings, as well as most personnel decisions. *Id.* However, each affiliate must seek approval from Sony Music for major financial decisions, including artist advances, and for the "hiring and personnel decisions regarding locally well-compensated employees." *See id.* at ¶ 9. Sony Music has guaranteed the obligations of at least one foreign affiliate. *See* Bondell Dep. at 55–56. Sony Music monitors the performance and reviews the budget of each affiliate, and the affiliates provide financial and management reports regularly. *See* Affiliate Affs. ¶ 9; Bondell Dep. at 47–48. Sony Music management and the management of the affiliates meet "quasi-regularly." *See* Bondell Dep. at 47, 50.

## DISCUSSION

*Standard of Review*

■ The burden of establishing personal jurisdiction over a defendant ultimately is upon the plaintiff. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *Hvide Marine Int'l Inc. v. Employers Ins. of Wausau,* 724 F.Supp. 180, 182 (S.D.N.Y.1989). If jurisdiction is challenged prior to discovery, the plaintiff may defeat the motion by a good faith pleading of legally sufficient allegations of jurisdiction. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). At this stage, the plaintiff may make a *prima facie* showing solely by allegations. *Id.* Where a motion testing jurisdiction is made after discovery, the plaintiff may still defeat the motion by making a *prima facie* showing, but this must include "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.; United Bank of Kuwait, PLC v. James M. Bridges, Ltd.,* 766 F.Supp. 113,

115 (S.D.N.Y.1991). If the defendant challenges plaintiff's factual allegations essential to establish jurisdiction, a hearing is required at which the plaintiff must establish personal jurisdiction by a preponderance of the evidence. *Ball,* 902 F.2d. at 197; *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984).

Here the parties have had the opportunity to conduct jurisdictional discovery. While the moving defendants have contested some of plaintiff's factual allegations, their motion is directed to a challenge of the sufficiency, not the credibility of those allegations. Upon examining the record, we determine that the jurisdictional issue can be resolved on the basis of undisputed facts.

*New York CPLR § 301 and "Doing Business"*

■ In a diversity action, a federal court must look to the law of the forum state to determine whether personal jurisdiction exists over a nonresident defendant. *Savin v. Ranier,* 898 F.2d 304, 306 (2d Cir.1990) (citing *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 222–25 (2d Cir.1963)). If the applicable statute of the forum state allows the court to exercise jurisdiction, the court must then consider whether the exercise of jurisdiction meets constitutional standards of due process. *See Savin,* 898 F.2d at 306; *Darby v. Compagnie National Air France,* 735 F.Supp. 555, 559 (S.D.N.Y. 1990).

Plaintiff asserts jurisdiction over the moving defendants on the basis of New York Civil Practice Law & Rules § 301. *See* Plaintiff's Mem. of Law at 11. Section 301 provides that "[a] court may exercise jurisdiction over person, property, or status as might have been exercised heretofore." N.Y.C.P.L.R. § 301. Section 301 incorporates the caselaw prior to its enactment which provided that a corporation may be subject to jurisdiction in New York for any cause of action even if unrelated to contacts in New York if it is "doing business" and therefore "present" in New York. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57–58 (2d Cir.1985). The New

York courts have construed this standard so that a foreign corporation must do business in New York "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917); *accord Laufer v. Ostrow*, 55 N.Y.2d 305, 310, 434 N.E.2d 692, 694, 449 N.Y.S.2d 456, 458 (1982). The New York courts have termed this test for doing business a "simple and pragmatic one," *Bryant v. Finnish National Airline*, 15 N.Y.2d 426, 432, 208 N.E.2d 439, 441, 260 N.Y.S.2d 625, 628–29 (1965), in which the court determines if the foreign corporation's activities in New York are "continuous and systematic." *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 536, 227 N.E.2d 851, 853, 281 N.Y.S.2d 41, 43, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). However, the caselaw demonstrates that evaluation of jurisdiction under this "doing business" standard requires close consideration of the facts and circumstances in each case, because no single factor is dispositive. *See H. Heller & Co., Inc. v. Novacor Chemicals Ltd.*, 726 F.Supp. 49, 52 (S.D.N.Y.1988); *Top Form Mills v. Sociedad Nationale Ind., Etc.*, 428 F.Supp. 1237, 1242 (S.D.N.Y.1977); *Sunrise Toyota, Ltd. v. Toyota Motor Co.*, 55 F.R.D. 519, 523 (S.D.N.Y.1972).

Plaintiff does not contend that the moving defendants have sufficient direct contacts with New York to meet the "doing business" standard. Rather, plaintiff argues that the moving defendants satisfy two tests under which a foreign corporation may be found to be "doing business" in New York based solely on a relationship with another entity that is "present" in New York. The presence of a local corporation does not necessarily create jurisdiction over a related foreign company. *See Delagi v. Volkswagenwerk AG of Wolfsburg*, 29 N.Y.2d 426, 432, 278 N.E.2d 895,

897, 328 N.Y.S.2d 653, 657 (1972). However, under New York law, jurisdiction may be obtained over a foreign company if it is a "mere department" of an entity that is present in New York, or if the relationship between the foreign corporation and the local one gives rise to the valid inference of an agency relationship. *See Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65, 67 (S.D.N.Y.1979); *Sunrise Toyota, Inc.*, 55 F.R.D. at 528. Plaintiff asserts that each of the moving defendants is a mere department of Sony Music, and that Sony Music acts as the de facto agent of each defendant so that they are all subject to the jurisdiction of this Court. *See* Plaintiff's Mem. of Law at 1–2.

## "Mere Department"

A corporate entity will be considered a "mere department" of its parent only if the foreign parent's control is "pervasive enough that the corporate separation is more formal than real." *H. Heller & Co. v. Novacor Chemicals Ltd.*, 726 F.Supp. 49, 54 (S.D.N.Y.1988) (citing *Taca Int'l Airlines, S.A. v. Rolls–Royce of England, Ltd.*, 15 N.Y.2d 97, 204 N.E.2d 329, 256 N.Y.S.2d 129 (1965)). To achieve jurisdiction, "the control over the subsidiary's activities ... must be so complete that the subsidiary is, in fact, merely a department of the parent." *Delagi v. Volkswagenwerk AG of Wolfsburg*, 29 N.Y.2d at 432, 278 N.E.2d at 897, 328 N.Y.S.2d at 657. This basis for jurisdiction is quite narrowly applied. In *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120–22 (2d Cir.1984), the Second Circuit delineated four factors to aid in determining whether one entity is a "mere department" of another for jurisdictional purposes.[9] Common ownership is the "essential" factor, while the three others are important: financial dependency of the sub-

---

9. Most "mere department" cases involve a New York subsidiary and a foreign corporate parent. However, as we noted in *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65, 67 n. 5 (S.D.N.Y. 1979), it makes no difference for jurisdictional purposes if the local entity is the parent and the foreign corporation is the subsidiary. *See also Titu–Serban Ionescu v. E.F. Hutton & Co.*, 434

F.Supp. 80, 83 (S.D.N.Y.1977), *aff'd without opinion*, 636 F.2d 1202 (2d Cir.1980). In this action, the relationship between Sony Music and the moving defendants is more complex, but all the involved entities share the same corporate parent, Sony Corp. We find it appropriate to consider such interrelated entities under the "mere department" test.

sidiary on the parent; degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and, the degree of the parent's control over the subsidiary's marketing and operational policies. *Beech Aircraft,* 751 F.2d at 120–22; *Morse Typewriter Co., Inc. v. Samanda Office Communications Ltd.,* 629 F.Supp. 1150, 1153 (S.D.N.Y.1986) (Weinfeld, J.).

■ While not all of the moving defendants are owned directly by Sony Music, they all share with Sony Music the ultimate ownership by Sony Corp. Thus, the first and essential element of the *Beech* test, common ownership, is satisfied here. There is no question that Sony Music exercises some control over the activities of the moving defendants. As discussed *supra,* Sony Music does require approval of major financial decisions of the moving defendants, reviews their budgets and is provided with regular financial reports by them. Sony Music has on occasion guaranteed at least one of the affiliates' financial obligations. *See* Bondell Dep. at 55–56. Sony Music also approves key personnel decisions, and assists the affiliates in strategy for negotiations with artists, and in formulating various business policies.

However, we find that this level of involvement by Sony Music does not make the moving defendants "mere departments" under the New York standard. The moving defendants are not "wholly dependent upon [the related entity's] financial support to stay in business." *Beech Aircraft,* 751 F.2d at 121. Each defendant maintains its own books, records, and bank accounts and functions independently financially in its day-to-day operations. Each defendant makes most personnel decisions and decides independently which artist to sign and which records to release within its territory.

This relationship is far less intimate than that which existed in one of the leading New York cases finding jurisdiction on the basis of "mere department" status. In *Taca Int'l Airlines,* the foreign parent company, owned through an intermediary

all of the stock of a New York subsidiary, whose sole business was to sell and service products manufactured by the parent company. *Taca Int'l Airlines, S.A. v. Rolls-Royce of England, Ltd.,* 15 N.Y.2d 97, 100–01, 204 N.E.2d 329, 330, 256 N.Y.S.2d 129, 131 (1965). Key executive personnel were former executives of either the parent or the intermediary, and they were assigned by the parent. Executives of the three companies met frequently to set the policies of the subsidiary. The subsidiary's employees were given technical training by the parent company, and all sales literature used by the subsidiary was written and published by the parent. *Id.* at 100–01, 204 N.E.2d at 330, 256 N.Y.S.2d at 131.

Further, the subsidiary owned no cars, their product, but ordered them from the parent only when a sale was made to a customer. The price paid by the subsidiary was lower than that ultimately charged to the customer, and the warranty was issued directly from the parent to the customer. The parent paid the subsidiary a fixed annual fee to service the cars under these warranties. *Id.* at 101, 204 N.E.2d at 330, 256 N.Y.S.2d at 131. The net income of the New York subsidiary was sent to the intermediary and appeared in that company's balance sheet, and ultimately appeared in the parent company's balance sheet. *Id.* On these facts, the New York Court of Appeals found that the New York subsidiary was a mere department of the foreign parent. *Id.* at 102, 204 N.E.2d at 331, 256 N.Y.S.2d at 132; *see also Public Administrator v. Royal Bank of Canada,* 19 N.Y.2d 127, 132, 224 N.E.2d 877, 879, 278 N.Y.S.2d 378, 381 (1967) (finding jurisdiction on "mere department" basis when relationship between parent and subsidiary was so intimate that "Royal Bank of Canada (France) is not merely a subsidiary of the Royal Bank of Canada but is, in fact, if not in name, the Royal Bank of Canada itself").

Cases in this Circuit also demonstrate that a closer level of corporate intimacy than that which exists in this case must be present in order to find jurisdiction on a "mere department" basis. In applying its

four factor test, the Second Circuit in *Beech* found that East, a New York subsidiary was a "mere department" of Beech Aircraft Corp. under New York Law. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984). East was wholly owned by Beech, and was its complete financial dependent. *Id.* at 120–21. Several Beech officers held the same positions at East, though their entire salaries were paid by Beech. *Id.* at 121. The subsidiary reported to a Beech executive at regular marketing meetings, and no evidence demonstrates that East held any directors' meeting of its own. Finally, the Court found that Beech "tightly controlled" the marketing operations of its subsidiary, including prescribing minimum inventory levels, accounting systems, advertising campaigns, and training of salespeople. *Id.* at 122. The relationship of the affiliates in the present case to Sony Music clearly does not reach the level of intimacy which existed in *Beech.*

In *Titu–Serban Ionescu v. E.F. Hutton & Co.*, 434 F.Supp. 80 (S.D.N.Y.1977), *aff'd without opinion*, 636 F.2d 1202 (2d Cir. 1980), Hutton (France) was a foreign corporation which was wholly owned by a wholly owned subsidiary of E.F. Hutton, a corporation subject to jurisdiction in New York. *Id.* at 81. Hutton (France) was incorporated by five officers of E.F. Hutton, another wholly owned subsidiary, and an individual formerly associated with a third wholly owned subsidiary. *Id.* at 82. Hutton (France) was capitalized at approximately $20,000 and paid no dividends. It was operated as a "guaranteed corporate subsidiary" of E.F. Hutton pursuant to Rule 322 of the New York Stock Exchange which provided that all its obligations and liabilities would be assumed or guaranteed by the member organization (E.F. Hutton) which "shall be fully responsible for all acts of such subsidiary." *Id.* at 82 (quoting NYSE Rule 322). Hutton (France) was principally a brokerage house which transmitted orders from its customers to E.F. Hutton for execution. More than half of its income and all of its American business was done through E.F. Hutton. E.F. Hutton apparently charged the subsidiary less or at least on a somewhat different basis than it charged unaffiliated brokers for clearing transactions. *Id.* In annual reports, pamphlets and other public documents, E.F. Hutton referred to Hutton (France) as a branch office or international division of the parent company. *Id.* The Court noted that this was not simply a case where a parent corporation provided services in New York for a foreign subsidiary. *Id.* Although the two entities were separately incorporated, "only one commonly-owned enterprise exists which relies on the joint endeavors of each constituent part and each corporation functions as an integral part of a united endeavor." *Id.*

In *Morse Typewriter v. Samanda Office Communications Ltd.*, 629 F.Supp. 1150 (S.D.N.Y.1986), a New York subsidiary, NTI, had received two substantial loans from its foreign parent NTL and paid a percentage of its revenues to NTL as part of a research and development cost sharing agreement. *Id.* at 1153. NTI had to obtain NTL's approval for major expenditures, and NTI's board of directors was controlled by NTL officers. *Id.* at 1153–54. However, the Court found that NTI was basically financially and operationally independent; "in sum, it appears that NTI exercises substantial discretion and independence within broad parameters established by its parent." *Id.* at 1154. Judge Weinfeld concluded that such a relationship did not make a subsidiary a mere department of its parent. *Id.* As this Court has stated:

> [U]nder New York law a parent of a multinational corporate enterprise may make broad policy decisions for its subsidiaries. Such control is inherent in the parent-subsidiary relationship and does not justify labeling a subsidiary a 'mere department' of the parent.

*Saraceno v. S.C. Johnson and Son, Inc.*, 83 F.R.D. 65, 71 (S.D.N.Y.1979).

Most important, in all three Southern District cases which have involved the predecessors of the companies concerned here, the courts have held that the affiliates are not subject to jurisdiction in New

York as "mere departments" of the related company doing business in New York. In *Larball Pub. Co., Inc. v. CBS Inc.*, 664 F.Supp. 704 (S.D.N.Y.1987), Judge Duffy provided the most complete description of the relationship between CBS, Inc. and its various affiliates. This relationship appears substantially similar to that between Sony Music and its affiliates, the successors to the CBS entities. Judge Duffy found that although CBS exercised "significant control" over the affiliates, "it does not rise to such a level as to make the subsidiaries mere departments of CBS." *Id.* at 707. Judge Duffy said:

> Importantly, there is no evidence that CBS' subsidiaries are financially dependent on CBS. They are separately incorporated and keep their own books, records, and bank accounts. The subsidiaries' profits are their own and are not counted by CBS on its books. CBS does file a consolidated financial statement with the Securities and Exchange Commission and in its Annual Report to its shareholders. For the most part, the subsidiaries select their own employees, except that key personnel, such as the subsidiaries' managing directors and others who report directly to them, must be approved by CBS.
>
> The evidence further suggests that the subsidiaries generally make their own independent decisions about signing artists within their territories and which songs to release. Major expenditures, however, including artist advances, must be approved by CBS.
>
> Thus, CBS' subsidiaries are sufficiently independent to avoid mere department status.

*Id.* at 707 (citations omitted); *see also Federal Record Manufacturing Co. v. CBS Inc.*, No. 81 Civ. 5092 (S.D.N.Y. May 4, 1982) (Griesa, J.) (CBS subsidiary in Holland not a mere department of CBS Inc.); *Intersong–USA Inc. v. CBS Inc.*, No. 84 Civ. 0998, 1990 WL 131191, 1990 U.S.Dist. LEXIS 11645 (S.D.N.Y. Sept. 6, 1990) (Keenan, J.) (foreign affiliates not "mere departments" of CBS). We conclude that the moving defendants are not subject to

jurisdiction as "mere departments" of Sony Music.

*Agency*

In *Frummer v. Hilton Hotels Int'l*, the New York Court of Appeals held that an agency relationship existed for jurisdictional purposes where one corporation "does all the business which [the other corporation] could do were it here by its own officials." *Frummer*, 19 N.Y.2d 533, 537, 227 N.E.2d 851, 854, 281 N.Y.S.2d 41, 44, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). In *Gelfand v. Tanner Motor Tours, Ltd.*, the Second Circuit interpreted the *Frummer* test

> to mean that a foreign corporation is doing business in New York 'in the traditional sense' when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.

*Gelfand*, 385 F.2d 116, 121 (2d Cir.1967), *cert. denied*, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968).

The moving defendants argue that they do no business in New York, because their only business is to produce, manufacture, promote and sell records within their own territories. Nor is there any business which they would do in New York were Sony Music not located here. According to the defendants, since there is no New York business for an agent to perform, Sony Music cannot possibly function as an agent for them. *See* Defendants' Mem. of Law at 10.

The moving defendants contend that the existence of the matrix agreements does not alter this view of their "business." While the parties do not dispute the terms of the agreements, they differ widely as to the agreements' significance. According to the moving defendants, these agreements are licensing arrangements which do not constitute "doing business" in New York. *Id.* at 10–11. Under these arrangements, each affiliate licenses its repertoire to Sony Music for use outside its own territory and

may license from Sony Music the repertoires of other affiliates and Sony Music for manufacture and sale within its own territory. Sales are made only by and for the licensee, who pays a fee to the licensor only when and if such sales are made. *Id.* Thus, the defendants argue that they make no sales in New York and that Sony Music acts for its own benefit, rather than on their behalf.

Plaintiff points out, however, that a record company requires a product to market and sell, which it can get only by obtaining the rights to commercially exploit the compositions of recording artists. *See* Plaintiff's Mem. of Law, at 16. Sony Music provides a large part of the affiliates' product by procuring new acts and producing master recordings of these acts. Under the matrix agreements, the affiliates then have the right to exploit these recordings commercially in their territories. *Id.* Through Sony Music's matrix agreements, each affiliate also gains access to the repertoires of all other affiliates. Further, each affiliate receives a fee for the use of one of its own recordings by other affiliates or Sony Music.

According to the plaintiff, sales in the moving defendants' territories of acts procured by Sony Music make up a significant percent of the moving defendants' annual revenue. *See* Plaintiff's Mem. of Law, at 16; Exhibit E to Affidavit of Brian D. Caplan, attorney for plaintiff (explanation of sales data of affiliates for fiscal period February 1, 1990 through January 31, 1991). The moving defendants dispute the accuracy of the plaintiff's analysis of this data. *See* Defendants' Reply Mem. of Law, at 4–6; Romano Aff. For the purpose of deciding this motion, we do not need to resolve this factual dispute. Even assuming defendants' arguments regarding the data to be correct, it is clear that the defendants derive hundreds of millions of dollars in profits from sales due to acts

signed by Sony Music.[10] Sony Music spends millions of dollars procuring new acts in the United States, signed to Sony Music in New York, which the moving defendants have the right to release in their territories. It is Sony Music which creates the master recordings used by the moving defendants to manufacture the records. Moreover, Sony Music distributes the recordings owned by each affiliate in New York and throughout the United States, and, through its matrix agreements with the other affiliates, Sony Music grants sublicenses for their distribution elsewhere. *See* Plaintiff's Mem. of Law, at 16. The moving defendants receive additional millions in fees derived from the exploitation of their own acts by Sony Music and the other affiliates through the matrix agreements. *See* Exhibit D to Affidavit of Brian D. Caplan (Chart "Sales Analysis for the Fiscal Period February 1, 1990 Through January 31, 1991"). Thus, according to plaintiff, the worldwide network of affiliates and Sony Music is very important to the business of each affiliate, and Sony Music's activities benefit the affiliates.

This precise issue was presented in two cases concerning affiliates of the predecessor to Sony Music, CBS. Facing virtually identical facts in *Larball* and *Intersong,* the courts split on the issue of whether the New York corporation functioned as an agent of the foreign affiliates for jurisdictional purposes.[11] Their disagreement was rooted in the different conceptions of the matrix agreements which divide the parties here. Like the present defendants, Judge Keenan in *Intersong* viewed these agreements simply as licensing arrangements. *Intersong,* 1990 WL 131191 at **5–6, 1990 U.S.Dist. LEXIS 11645, at *15 (S.D.N.Y. Sept. 6, 1990). The Court then found that CBS did not act on behalf of the affiliates, which functioned as separate and distinct entities and received "mere royalties" as a result of the matrix agreements. *Id.* 1990

---

**10.** In their memorandum of law, defendants concede that a substantial percent of the sales of the moving defendants are attributable to product licensed to the moving defendants under the matrix agreements. *See* Defendants' Mem. of Law, at 13.

**11.** The third case concerning a CBS affiliate, *Federal Record Manufacturing Co. Ltd. v. CBS Inc.,* No. 81 Civ. 5092 (S.D.N.Y. May 4, 1982), is an unpublished opinion which summarily concluded without discussion that CBS was not an agent for the Dutch affiliate.

WL 131191 at **5–6, 1990 U.S.Dist. LEXIS 11645, at *13, *15.

In *Larball*, however, Judge Duffy found that the matrix agreements granted CBS the exclusive right to manufacture and distribute recordings made from the subsidiaries' repertoire all over the world other than in the home territory of the subsidiary which had provided the recording. *Larball Pub. Co., Inc. v. CBS Inc.*, 664 F.Supp. at 707. The agreements gave CBS the right to distribute records made from the subsidiaries' recordings in New York and throughout the United States, and allowed them to grant sublicenses to its subsidiaries all over the world. *Id.* Thus, like the present plaintiff, Judge Duffy believed that "were CBS not handling the subsidiaries' worldwide sales, the subsidiaries would be required to perform this function themselves." *Id.* at 707–08. Judge Duffy found that CBS was acting as an agent for its subsidiaries' record sales worldwide. *Id.* at 707.

We believe that the view of the plaintiff here and the Court in *Larball* most accurately addresses the realities of the worldwide recording business of Sony Music and the Sony affiliates. *See Bulova Watch Company, Inc. v. K. Hattori & Co.*, 508 F.Supp. 1322, 1335 (E.D.N.Y.1981) (evaluation of jurisdiction must deal in realities rather than formalities of corporate relationships). We find that the activities of Sony Music in New York are part of affiliates' "business" for purposes of the *Frummer* test. Further, we conclude that these activities are sufficiently important to the affiliates that if they had no representative, their own officials would undertake to perform them. *See Gelfand*, 385 F.2d at 121.[12]

The situation presented here is very different from that which confronted us in *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65 (S.D.N.Y.1979). There we found

that Johnson, a Wisconsin corporation licensed to do business in New York, did not serve as the agent of Johnson Wax Europlant, B.V. ("Europlant"), its foreign subsidiary. *Id.* at 66–68. Europlant's basic business was the manufacture of Johnson products for Johnson marketing companies in Europe. *Id.* at 67. As the defendant there stated, "Europlant's products are *European* products. They are sold in foreign countries under foreign labels.... Moreover, the advertising for Europlant's products is done by the Europlant marketing companies...." *Id.* at 68 (quoting Defendant's Reply Memorandum at 41). We concluded that Johnson did not meet the *Frummer* test, and that Johnson did not act on Europlant's behalf in New York. *Id.*

In the present case, much of the product marketed abroad derives from the recordings of artists signed by Sony Music in New York. Second, the foreign subsidiaries market their material in New York exclusively through Sony Music, the New York corporation. And it is through Sony Music and the interlocking matrix agreements that the foreign subsidiaries are able to market their products throughout the world. Unlike *Saraceno*, the subsidiaries are not foreign corporations with little contact or relationship to New York. For all of the above reasons, we find it appropriate to obtain jurisdiction over the foreign affiliates on the basis of their agency relationship with Sony Music.

While defendants cite the *Frummer* test, they argue that "to constitute an agent for jurisdictional purposes, the 'alleged agent must have acted in this state for the benefit of and with the knowledge and consent of the non-resident and the non-resident must exercise some element of control over the agent." *H. Heller & Co., Inc. v. Novacor Chemicals Ltd.*, 726 F.Supp. 49, 55 (S.D.N.Y.1988) (quoting *Selman v. Har-*

---

**12.** It is worth noting that though defendants share the *Intersong* Court's more narrow view of the matrix agreements, they do concede that "[t]he only plausible conclusion that could be drawn is that, if Sony Music was [sic] not in New York, the moving defendants would negotiate another 'matrix' agreement with another en-

tity." *See* Defendants' Reply Memorandum of Law in Further Support of Motion to Dismiss for Lack of Personal Jurisdiction, at 7 (hereinafter "Defendants' Reply Mem. of Law"). This implicitly acknowledges how integral the work of Sony Music is to the affiliates' business.

vard Medical School, 494 F.Supp. 603, 611 (S.D.N.Y.), aff'd without opinion, 636 F.2d 1204 (2d Cir.1980)). Defendants thus contend that since an affiliate cannot exercise control over a parent company, Sony Music cannot possibly serve as the agent of the Sony affiliates. See Defendants' Mem. of Law, at 13. In Intersong, the Court also noted that the foreign affiliates could not exert control over CBS Records, thus making CBS Records their agent in New York. Intersong, 1990 U.S.Dist. LEXIS 11645, at *15 (S.D.N.Y. Sept. 6, 1990).

■ However, the common ownership of two corporations may "give rise to a valid inference as to the broad scope of the agency." Frummer, 19 N.Y.2d at 538, 227 N.E.2d at 854, 281 N.Y.S.2d at 45. The interrelatedness of the corporations is the factor on which the courts have focused, rather than on the "control" of one by the other. In the context of related corporate entities, the Frummer standard remains the "decisive test" for agency, and the courts have not required that control be proven as an element for an agency relationship to obtain jurisdiction. Gelfand, 385 F.2d at 120. In Bialek v. Racal–Milgo, Inc., 545 F.Supp. 25, 32 (S.D.N.Y.1982), for example, the Court found that a New York subsidiary served as the agent of the foreign parent corporation, as both were "components of a tightly-knit commercial organization of common-owned entities, and that [the subsidiary] performs all the business services in New York that [the parent] could perform there by its own officials … precisely the facts that the courts look for in applying Frummer's agency test."

Moreover, the courts have found that a "parent" can serve as the agent of its subsidiary:

The relationship of parent and subsidiary, though not by itself jurisdiction-conferring, gives rise to an inference of a broad agency relationship between the two, even when, as here, it is the parent that is within the jurisdiction and not the subsidiary.

Jayne v. Royal Jordanian Airlines Corp., 502 F.Supp. 848, 856 (S.D.N.Y.1980); see also Freeman v. Gordon & Breach, Science Publishers, Inc., 398 F.Supp. 519, 521 (S.D.N.Y.1975) (rules developed by New York courts for obtaining jurisdiction over foreign parent through presence of New York subsidiary apply equally to converse situation of foreign subsidiary and New York parent); Saraceno v. S.C. Johnson & Son, Inc., 83 F.R.D. 65, 67 n. 5 (S.D.N.Y. 1979) (immaterial whether jurisdiction sought over foreign subsidiary or parent); Titu–Serban Ionescu v. E.F. Hutton & Co., 434 F.Supp. at 83 (similarly).

■ Clearly, in this situation, a subsidiary will not "control" a New York parent. In Jayne, for example, the court found that the close relationship between a Jordanian government-owned airline subject to jurisdiction in New York and a Jordanian air charterer created the inference that the airline served as agent for the charterer, thus permitting assertion of jurisdiction over the air charterer. Jayne, 502 F.Supp. at 858–59. The airline served as a conduit for the passage of chartering information, made its facilities available to the charterer's clients, solicited business for the charterer, negotiated business on the charterer's behalf, and guaranteed some of its loans. Id. The Court also held that the close relationship between the two corporate entities subjected the charter to jurisdiction in New York as the airline's "mere department." Id. at 859. Therefore, the Court found that the New York parent controlled the foreign subsidiary for purposes of the "mere department" test, yet could also serve as this subsidiary's agent. Thus, these two theories of jurisdiction are clearly not, as defendants claim, mutually exclusive, see Defendants' Reply Mem. of Law, at 1, and "control" of the New York entity has not been essential for a finding of an agency relationship. See also Larball, 664 F.Supp. at 707–08.

■ Ultimately, the important issue in evaluating jurisdiction is that of fairness. As Judge Weinstein has said:

Although the 'agency' and 'mere department' theories of jurisdiction are stated as separate principles, it should be clear from the mass of cases dealing with this

problem that a line cannot be simply drawn between the two. The apparently distinct notions are metonyms for a jurisdictional balancing assessing the fairness of requiring an out-of-state party to defend itself in New York when it derives benefits from in-state activities. The factors to be weighed include the significance of the New York business to the defendant's overall activities.

*Bulova Watch Company, Inc. v. K. Hattori & Co.,* 508 F.Supp. 1322, 1334 (E.D.N.Y. 1981) (citations omitted). In *Frummer,* the New York Court of Appeals also addressed the issue of fairness:

> When their activities abroad, either directly or through an agent, become as widespread and energetic as the activities in New York conducted by [the nonresident corporation], they receive considerable benefits from such foreign business and may not be heard to complain about the burdens.

*Frummer,* 19 N.Y.2d at 538, 227 N.E.2d at 854, 281 N.Y.S.2d at 45. Thus, when two corporations have common ownership and their activities are interrelated as here, they may have an agency relationship for jurisdictional purposes, even if the resident corporation is not controlled by the nonresident entity. This may be true even if the intimacy of the relationship between the two corporations does not reach the level of finding "mere department" status. *See Larball,* 664 F.Supp. at 707–08. Though we do not find that the affiliates are "mere departments" of Sony Music, we conclude that Sony Music does serve as their agent, and so they are subject to personal jurisdiction in New York.

*Constitutional Due Process*

 Of course, in order to establish personal jurisdiction, the plaintiff must show that the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). In *Hanson v.*

*Denckla,* the Court stated that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958); *see also Asahi Metal Industry Co. v. Superior Ct.,* 480 U.S. 102, 108–09, 107 S.Ct. 1026, 1030, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). If this requirement of purposeful availment is satisfied, the courts may also evaluate the defendant's contacts with the forum in light of a number of other factors such as: the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief, as well as "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in further fundamental substantive social policies." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033. We find that the contacts evidenced in this record demonstrate "purposeful availment" by the defendants, and, after a consideration of the other factors, we conclude that the assertion of personal jurisdiction over the defendants would not offend the standards of constitutional due process.

## CONCLUSION

For all of the reasons discussed above, we find that the moving defendants are subject to the personal jurisdiction of this Court. Therefore, their motion to dismiss is hereby denied. The parties are to submit a discovery schedule to the Court in writing no later than June 25, 1992.

SO ORDERED.